**In re RADIOLOGY ASSOCIATES, INC. LITIGATION.**

**Civ. A. No. 9001.**

Court of Chancery of Delaware, New Castle County.

Submitted: May 15, 1991.
Decided (After Reargument): Nov. 1, 1991.

Stephen E. Jenkins, of Ashby, McKelvie & Geddes, Wilmington, for plaintiff.

Howard M. Handelman, and John H. Newcomer, Jr., of Bayard, Handelman & Murdoch, P.A., Wilmington, for defendants.

## OPINION

CHANDLER, Vice Chancellor.

This lawsuit, which began in the spring of 1987, asserted claims by plaintiff, Robert M. Kurtz, M.D. ("Dr. Kurtz"), against the defendants based on breach of contractual and fiduciary duties. *See Kurtz v. Papastavros*, Del.Ch., C.A. No. 9001, 1988 WL 47320, Hartnett, V.C. (May 9, 1988). The defendants in this case are Christos S. Papastavros, M.D. ("Dr. Papastavros"), Papastavros Associates, P.A. ("Papastavros Associates"), Radiology Associates, Inc. ("Radiology"), Radiology Imaging Corporation ("New Radiology"), John S. Piendak, M.D. ("Dr. Piendak"), Garth A. Koniver, M.D. ("Dr. Koniver"), and Thomas W. Fiss, Jr., M.D. ("Dr. Fiss"). In addition, plaintiff seeks an appraisal remedy for the fair value of his 250 shares of the 9950 outstanding shares of Radiology that he owned as of May 6, 1987, which was the date that Radiology merged into New Radiology.

After a trial on the issue of liability, this Court held for defendants as to the contractual claims. *See In re Radiology Associates, Inc.*, Del.Ch., C.A. No. 9001, 1990 WL 67839, Chandler, V.C. (May 16, 1990), slip op. at 36. However, this Court held that the defendants' failure to fully disclose information as to the merger into New Radiology, which eliminated Dr. Kurtz's interest in Radiology and froze him out of New Radiology, and failure to use due care in effectuating the merger, entitled plaintiff to damages for his breach of fiduciary duty claims based on entire fairness. *See id.* Further, this Court held that Dr. Papastavros' use of Radiology, in his capacity as majority shareholder of Radiology, in effectuating certain transactions (loans from Radiology to Limestone Professional Building, to Dr. Papastavros and to the Land–Ho partnership) in a manner not entirely fair to plaintiff entitled plaintiff to damages.

Following the trial on liability, the parties have settled the issue of what represents the proper amount of damages for the entire fairness breach relating to the failure to fully disclose and to use due care and for the loans from Radiology to Limestone Professional Building and to Dr. Papastavros. Thus, this Court must decide what amount represents the fair value of plaintiff's Radiology shares as of May 6, 1987 (his appraisal claim) and what amount represents the damages plaintiff suffered from the Land–Ho loans in order to compensate plaintiff for Dr. Papastavros' failure to act in an entirely fair manner in regards to these loans. Finally, this Court must decide plaintiff's claim for costs, including expert witness fees.

Testimony on the damages and fair value phase of this case was heard over two days in November 1990. Part I of this opinion provides a brief statement of the facts. Part II addresses the issue of the fair value of plaintiff's shares as of May 6, 1987. Part III addresses the issue of the amount of damages to be awarded to plaintiff as a result of the Land–Ho loans. Part IV deals with plaintiff's claim for costs and expert witness fees.

## I. FACTUAL HISTORY

Papastavros Associates was a professional corporation which provided direct radiological services to patients in New Castle County, Delaware and the surrounding areas. Papastavros Associates employed the radiologists that provided these services, paid their salaries and also billed patients for services performed. Drs. Papastavros, Alden and later Piendak owned all of the Papastavros Associates' stock.

Radiology was a separate corporate entity that owned the radiological machines and employed all of the nonmedical personnel utilized by Papastavros Associates. Radiology solely dealt with Papastavros Associates and billed it on a cost plus basis. Initially, Radiology issued all of its stock to Drs. Papastavros and Piendak. Over time, Dr. Papastavros, who owned the majority of Radiology stock, permitted doctors employed by him to purchase shares of Radiol-

ogy stock. Radiology's shareholders would receive a return on their investment in the form of a "salary."

Drs. Papastavros and Piendak hired Dr. Kurtz to work for Papastavros Associates in July of 1973. In 1979, Dr. Papastavros permitted Dr. Kurtz to purchase 2.5% of Radiology's class A and B stock for $33,000. It is uncontested that the books of Radiology show that for several years Dr. Kurtz, Koniver and later Fiss all received income from Radiology representing their proportionate stock ownership. During the time Dr. Kurtz was a shareholder, the record shows that payments to him from Radiology increased from $4,800 per year to more than $40,000.

At various times, Dr. Papastavros used his position as majority shareholder of Radiology to effectuate certain loans. One of these loans was actually a series of loans referred to as the "Land–Ho" loans. Land–Ho was a partnership of which Dr. Papastavros was the capital partner. The Land–Ho partners had formed the partnership to develop New Jersey beach houses. In 1984 and 1985, Radiology loaned Land–Ho a total of $715,000. A mortgage secured $267,500 and a receipt certified $150,000 of this loan.

In 1984, a group consisting of Drs. Koniver, Fiss and later Mansoory formed New Radiology. In the early spring of 1987, Drs. Papastavros, Koniver, Fiss and Mansoory transferred their shares of Radiology to New Radiology for a corresponding percentage of New Radiology's shares. On May 6, 1987, Radiology merged into New Radiology pursuant to the short form merger statute, and Dr. Kurtz's shares were eliminated, for which he was paid $400 per share. See 8 Del. C. § 253. Drs. Koniver, Fiss and Mansoory were directors of New Radiology at the time of the merger.

On May 8, 1987, Dr. Kurtz received three documents informing him that he had been merged out of Radiology, that he had been fired as an officer of Radiology and that Papastavros Associates was being dissolved as of September 30, 1987. The new entity, Papastavros Associates Medical Im-

aging, that consisted of Drs. Koniver, Fiss and Mansoory, did not employ or offer employment to Dr. Kurtz. As of the date of the merger, Dr. Kurtz held 250 of the 9950 outstanding shares of Radiology.

## II. THE FAIR VALUE OF DR. KURTZ'S SHARES

Plaintiff, Dr. Kurtz, challenges the fairness of the merger price. Plaintiff contends that Radiology's fair value was $2300 per share on May 6, 1987, the merger date. Plaintiff's conclusion rests primarily on the testimony of his valuation expert, Anne Danyluk, who is manager of Valuation Services at Coopers & Lybrand's Philadelphia office. Defendants dispute this conclusion and contend that the fair value was $457 per share on the merger date. Defendants' conclusion rests primarily on the testimony of their valuation expert, Charles Stryker, who is a business valuator for the "Benchmark" subsidiary of KPMG Peat Marwick.

■ At the outset of the valuation analysis, plaintiff insists that this Court may consider defendants' breach of fiduciary duty in determining Radiology's fair value. Defendants argue that the parties' settlement agreement compensates plaintiff for the breach of fiduciary duty. Plaintiff contends that the settlement agreement explicitly carved out an exception that allows plaintiff to discuss the breach of fiduciary duty in the valuation analysis.

I believe the phrase "we are not prevented from mentioning" is ambiguous. (*See* Pl.Exh. B at 2.) Thus, I look to the parties' intent. I conclude that the parties intended the settlement agreement to compensate plaintiff for whatever damage he incurred as a result of the breach of fiduciary duty. To further consider this breach in the fair value analysis possibly would result in a double recovery for plaintiff. It is nonsensical to believe that defendants agreed to pay plaintiff twice for his injury from the breach. Thus, I ignore defendants' breach of fiduciary duty in determining Radiology's fair value.

### A. *Plaintiff's Valuation Methodology*

Plaintiff's expert attempted to value Radiology by using two different methods: (1) a comparable company approach and (2) a discounted cash flow approach. Further, after determining the outcomes from the methods, plaintiff's expert argued that adjustments to the results were necessary in order to account for Radiology's S corporation status; in order to include Radiology's non-operating assets; and in order to alleviate the minority discount implicit in its valuation methods.

#### 1. The Comparable Company Method

■ The comparable company approach attempts to value companies first by finding comparable publicly-traded companies. *See Harris v. Rapid–American Corp.*, Del. Ch., C.A. No. 6462, 1990 WL 146488, Chandler, V.C. (Oct. 2, 1990), slip op. at 19. After identifying a comparable company, this approach calculates the value of the company through the use of earnings and other multiples. *See id.* at 19–20. This Court has affirmed the general validity of this approach. *See id.* at 21.

■ "The first step in doing a comparable companies analysis is to compile a list of comparative companies." *Id.* at 19. In this case, Ms. Danyluk chose two companies with which she wished to compare Radiology: MEDIQ Incorporated ("MEDIQ") and MMI Medical ("MMI"). The companies chosen for comparison by plaintiff's expert differ significantly from Radiology. First, MMI derives its revenue from the operation of mobile radiological units, from the leasing of such units and from providing maintenance and repair services for radiological equipment. MEDIQ derives only 24% of its revenues from diagnostic imaging services, and MEDIQ provided these services through mobile units. On the other hand, Radiology derives its revenue solely from providing non-mobile radiological services. Further, defendants point out significant differences in revenues, size, profitability, and growth rates:

| | Radiology | MEDIQ | MMI |
|---|---|---|---|
| Revenues | $4.8 million | $187.7 million | $28.2 million |
| Total Assets | $3.4 million | $239.9 million | $30.9 million |
| Pre-tax Profit Margin | 22.4% | 7.6% | 3.7% |
| Revenue Growth Rate | 7.2% | 38.2% | 35.5% |
| Earnings Growth Rate | 10.4% | 34.4% | 13.4% |

Finally, MEDIQ and MMI cover much larger geographic areas than Radiology.

The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison. At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes. *See Neal v. Alabama By–Products Corp.*, Del.Ch., C.A. No. 8282, 1990 WL 109243, Chandler, V.C. (Aug. 1, 1990), slip op. at 21, *aff'd*, Del.Supr., 588 A.2d 255 (1991); *Citron v. E.I. DuPont de Nemours & Co.*, Del.Ch., 584 A.2d 490, 510 (1990). In this case, the differences between Radiology and MMI and MEDIQ as to product mix, revenues, profit margins, revenue and earnings growth rates, assets and geographic markets combine to make any comparison with Radiology meaningless.

2. The Discounted Cash Flow Method

The second method Ms. Danyluk used in attempting to value Radiology was the discounted cash flow method.

In theory, the value of an interest in a business depends on the future benefits discounted back to a present value at some appropriate discount (capitalization) rate. Thus, the theoretically correct approach is to project the future benefits (usually earnings, cash flow, or dividends) and discount the projected stream back to a present value.

S. Pratt, *Valuing a Business* 25 (2d ed. 1989). The Delaware courts have affirmed the validity of this method of valuation repeatedly. *See Neal, supra*, at 16; *Cede & Co. v. Technicolor*, Del.Ch., C.A. No. 7129, 1990 WL 161084, Allen, C. (Oct. 19, 1990), slip op. at 17.

The DCF model entails three basic components: an estimation of net cash flows that the firm will generate and when, over some period; a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and finally a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.

*Cede & Co., supra*, at 17–18. The quality of the projection as to the future benefits over some period and the residual or terminal value is central to the reliability of the underlying methodology of the discount cash flow method. *See Harris, supra*, at 14.

(a) *Projected Revenues and Terminal Value*

█ In *Harris*, this Court declined to use the discounted cash flow method because the projections on which petitioners relied were too speculative. *See Harris, supra*, at 15. The projections in *Harris* were rejected because management did not create them and did not have any input with the third party who created them. In this case, Ms. Danyluk used projections prepared by the Delaware Trust Company for its internal purposes of assessing an application for a multi-million dollar loan for an ESOP. It is not as important that management itself did not create the projections as much as management had input with their creation. That is, although management itself did not do the "number crunching," it had input directly and indirectly (via Radiology's accountant, Barry Crozier, who worked with Delaware Trust in creating the projections). Further, Delaware Trust created the projections for a business purpose (the

propriety of a loan) completely unrelated to this lawsuit. Also, Delaware Trust's projections began from fact: they created the projections by making adjustments to and applying a growth rate to *historical* earnings. For all of these reasons, I believe that the projections are reliable and should be used in applying the discounted cash flow approach.

Ms. Danyluk, however, did not use the exact projections of the Delaware Trust Company. She adjusted the five-year revenue projection of 5% growth annually to 7% annually. Ms. Danyluk did use the 5% growth figure used by the Delaware Trust Company in her terminal year calculation.

Ms. Danyluk justified a change in the five year revenue projection by relying on three factors: historical earnings, an analysis of the industry and an analysis of other projections. The parties argue over exactly what the historical earnings growth rate was. However, the Delaware Trust Company had the information both sides put forth to argue their respective positions available when they made their projections. Thus, Ms. Danyluk's reliance on this factor for adjusting the growth rate upward is without merit since the Delaware Trust Company undoubtedly considered historical earnings in projecting a future earnings growth rate. Similarly, Ms. Danyluk's second factor, an industry analysis, reflects information available to the Delaware Trust Company when they made their projections and information to which they undoubtedly referred in creating the earnings growth rate projections. Finally, Ms. Danyluk relied on the fact that other projections predicted higher growth rates. Ms. Danyluk did not explain who made these projections, how they were different, and why they were different. The concept of "other projections," in my opinion, is too amorphous and insufficient to warrant a deviation from the Delaware Trust Company's projections as to the growth rate.

Since I have adjusted the proper growth rate in the discounted cash flow analysis down to 5%, I also must adjust expenses projected on a percentage of net sales basis (*e.g.*, general administrative expenses and adjusted depreciation).

In determining the projected net cash flows for years 1987 through 1991 and the terminal year, Ms. Danyluk also made an adjustment for officer's salaries. Ms. Danyluk added back as income the distributions made to the doctors as salaries and as part of the general and administrative expenses. However, she does allow a deduction for the reasonable salaries of two administrators adjusted for a nominal raise each year. Defendants argue that the salaries were not earnings.

This Court specifically stated that the distributions were earnings:

> Dr. Kurtz understood that the vast bulk of Radiology's income would be distributed to the shareholders in accordance with their proportionate ownership of stock. Part of these distributions would come to the stockholders in the form of a "salary" that was in actuality a form of return on equity. It is uncontested that the books of Radiology show that for several years Drs. Kurtz, Koniver and later Fiss all received income from Radiology representing their proportionate stock ownership.

*In re Radiology Associates, Inc., supra,* at 9–10. Any claim by defendants that the salary expenses do not represent, at least in part, a return on equity is wholly without merit. If the salaries do not represent entirely a return on equity, they represent, at least, a partial return on equity. Thus, Ms. Danyluk's calculations which, in effect, treat the salaries as part salary expense and part return on equity is much more appealing than defendants' desire to treat the distributions entirely as salary expenses and general and administrative expenses.

Defendants claim that if I treat some of the salary and general administrative expenses as returns on equity and not expenses, I also must adjust revenue. That is, defendants argue that Radiology bills Papastavros on a cost plus basis. Thus, if I reduce the amount of costs (expenses), I also must reduce Radiology's revenue.

Defendants' argument is without merit. They fail to distinguish the difference between how Radiology treats an item and how Radiology should treat an item. That is, Radiology should treat some or all of the salary distributions as returns on equity. However, this does not mean that Radiology will change its treatment of the distributions as expenses. In fact, Radiology most likely will continue to treat it as an expense and, as such, will bill Papastavros Associates on a cost (including the salary distributions) plus basis. Thus, I make no further adjustment to the treatment of salary distributions.

Having made the adjustments to the projected growth rate, the expenses as a percentage of net sales and "salary" expenses, I am able to determine the projected net cash flows for years 1987 through 1991 and the terminal year. These projections of net cash flow are $744,000 for 1987; $1,218,000 for 1988; $1,301,000 for 1989; $1,388,000 for 1990; $1,480,000 for 1991; and $1,556,000 for the terminal year.

### (b) Discount Rate

Having decided what are the proper projected revenues for 1987 through 1991 and for the terminal year, the third element that this Court must calculate in applying the discounted cash flow method is the proper discount rate. The discount rate attempts to reduce the projected future revenues to present value. See Cede & Co., supra, at 68.

Ms. Danyluk applied a 14% discount rate. On the other hand, defendants argue that 17% or 16.5% is the proper discount rate. Ms. Danyluk arrived at her discount rate by using the Capital Asset Pricing Model ("CAPM"). "That model estimates the cost of company debt (on an after tax basis for a company expected to be able to utilize the tax deductibility of interest payments) by estimating the expected future cost of borrowing; it estimates the future cost of equity through a multi-factor equation and then proportionately weighs and combines the cost of equity and cost of debt to determine a cost of capital." Id. at 68. This Court has affirmed the general validity of this approach for estimating the cost

of capital component in the discounted cash flow model. See id. at 70.

The first step in applying the CAPM is to determine the expected future cost of equity. Ms. Danyluk determined the expected future cost of equity (re) by utilizing the CAPM equation of: $re = rf + B \ (rm\text{-}rf)$. The letters rf symbolize a risk free rate of return. Ms. Danyluk used 8.82% which was the U.S. government long-term bonds average for the week ending May 6, 1987, as her rf. The market risk premium, rm-rf, is equal to the excess of the market rate of return, rm, over the risk free rate of return. Ms. Danyluk used a market premium of 13.5% that research conducted at the University of Chicago by Ibbotson Associates determined to be the mean for small (i.e., less than $100 million) capitalization stock interests for the period 1926 through 1986. (Pl.Exh. 74 at 13). Finally, the B is the Beta factor which represents "the non-diversified risk associated with the economy as a whole as it affects this firm." Cede, supra, at 69. In this case, Ms. Danyluk used a Beta of .95. After plugging these numbers into the equation, Ms. Danyluk calculated the cost of equity to be 21.6%.

The second step in applying the CAPM is to determine the after tax expected future cost of borrowing. Ms. Danyluk determined the future cost of debt by taking the interest rate of A-rated industrial bonds for the week of May 6, 1987, according to Standard & Poors' bond guide (9.8%) and reducing it by a tax rate (34%) in order to take account of the tax deductibility of interest expenses. The outcome of this calculation was 6.47%.

As discussed later, Radiology was a non-taxable entity. Thus, Radiology does not deserve its cost of debt to be reduced by taxes since it paid no taxes. Therefore, I use 9.8% as Radiology's cost of debt. To the extent plaintiff argues that I must adjust the Beta factor and the cost of equity if I make no deduction for taxes in determining the cost of debt, his arguments are, at best, conclusory and afford no basis for these adjustments.

The final step in the CAPM is to determine the weighted average cost of capital (WACC). The WACC is the weighted average of the cost of debt and equity which represents the average cost of capital. In this case, Ms. Danyluk determined that the cost of debt should carry a 49% weight and that the cost of equity should carry a 51% weight. However, Ms. Danyluk did not use Radiology's debt to equity ratio, which was 21% to 79%, in calculating the WACC. Instead, she used a hypothetical debt to equity ratio of 49% to 51%. Ms. Danyluk's justification for the use of the hypothetical ratio was that the hypothetical ratio reflected the industry average capital structure, that Radiology's deviation from the industry average reflects a hidden value (*i.e.*, underleveraging) in the company, and that the company could and should maximize shareholder value by attaining the optimal capital structure (*i.e.*, the industry average debt to equity ratio). Thus, Ms. Danyluk argued that this Court should employ the hypothetical rather than the actual debt to equity ratio in attempting to value the company.

Defendants attack Ms. Danyluk's use of the industry average in two ways. First, they argue that the hypothetical capital structure that Ms. Danyluk used was not the industry average. Ms. Danyluk calculated the hypothetical capital structure by taking a weighted average of the capital structures of MEDIQ and MMI. Defendants argue that the use of MMI's and MEDIQ's capital structures as representative of the industry average was inappropriate because of their noncomparability to Radiology. However, defendants fail to recognize that the choice of companies for the comparable company valuation approach is a much more comprehensive analysis than the choice of companies for the decision of whether they belong to the same industry. Indeed, there is little doubt that the proper Standard Industrial Classification ("SIC") for all three of these companies falls within the same industry: SIC Code 807–1, which is the medical services or medical laboratory services industry. Further, the WACC of MMI and MEDIQ more likely represent a figure that is closer to the "industry average" than Radiology's own capital structure because the average of two companies within the same industry is, for the most part, a better indication of an industry average than one company's figures; because they are much larger than Radiology; and because they are publicly traded.

Even if Ms. Danyluk's hypothetical capital structure represents a debt to equity ratio that is closer to the industry average, defendants argue (and I agree) that the use of the industry average rather than Radiology's actual capital structure was improper. The entire focus of the discounted cash flow analysis is to determine the fair value of Radiology. I am not attempting to determine the potential maximum value of the company. Rather, I must value Radiology, not some theoretical company. Plaintiff has introduced no evidence (*e.g.*, Radiology's debt to equity ratio trends or goals) that implies that Radiology will mimic the industry's debt to equity ratio. Given the lack of evidence as to the applicability of the industry average to Radiology, I will use Radiology's own debt to equity ratio in determining its WACC. Thus, I use 18% ([29.63% × 9.80%] + [70.37% × 21.65%] = 18.14%) as the discount rate in applying the discounted cash flow method.

In applying the discount rate to the terminal year, Ms. Danyluk subtracted her terminal growth rate (5%) from her discount rate (14%). Ms. Danyluk then reduced the terminal value to present value using her discount rate of 14%. The financial community and this Court recognizes these valuation mechanics for the terminal year as acceptable. *See* R. Brealy and S. Myers, *Principles of Corporate Finance* 64 (2d ed. 1988). Given my prior findings as to the growth rate, the net income adjustments and the discount rate, I adjust the terminal value to equal $6,020,000.

### 3. Adjustments

The final facet of Ms. Danyluk's analysis are her adjustments to her valuation analyses. Given my rejection of Ms. Danyluk's comparable company analysis, I will focus on the adjustments as she applied them to

the discounted cash flow analysis. In deriving her final calculation of Radiology's value under the discounted cash flow method, Ms. Danyluk made three adjustments to the raw discounted cash flow calculation: the implicit minority discount adjustment, the S–Corp. adjustment and the adjustment for non-operating assets.

### (a) *Implicit Minority Discount Adjustment*

■ In determining the fair value of a shareholder's shares, the Court first must determine the company's fair value as a whole. *See Cavalier Oil v. Hartnett*, Del. Supr., 564 A.2d 1137, 1144 (1989). In the second step, the Court determines plaintiff's share by merely using his proportionate interest (*i.e.*, the number of shares plaintiff owns divided by the number of shares outstanding). This Court will not weigh valuation factors at the shareholder level. *See Harris, supra*, at 29. *See also Cavalier Oil, supra*, at 1144.

■ Ms. Danyluk argued that the raw discounted cash flow calculation includes an implicit minority discount. She argued that the discounted cash flow analysis assumes a required rate of return for a minority interest and this Court must adjust from that basis to a controlling (100%) basis. That is, the discounted cash flow analysis fails to value fully the company as a whole with a premium over market price. Thus, she increased her raw discounted cash flow calculation by 30%, which purports to represent a fair estimate for premiums over market price.

Defendants argue that no matter if the plaintiff labels the 30% as a premium or recompense for a discount, the excess over the discounted cash flow calculation is inappropriate in this case. I agree. The discounted cash flow method purports to represent the present value of Radiology's cash flow. The calculation arguably may have left out a premium that normally accrues when shareholders sell a company. However, "the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred." *Cavalier Oil, supra*, at 1145. Plaintiff is not entitled to the proportionate sales value of Radiology. Plaintiff is entitled to the proportionate value of Radiology as a *continuing shareholder*. The discounted cash flow analysis, as employed in this case, fully reflects this value without need for an adjustment.

### (b) *The S–Corp. Adjustment*

■ The second adjustment Ms. Danyluk made to her raw discounted cash flow calculation was an adjustment to reflect the S–Corp. status of Radiology. That is, Ms. Danyluk argued that her valuation analysis calculated Radiology's value as a C–Corp. (a taxable entity). Thus, she argued that this Court must adjust the value of Radiology upward by 51.7% in order to properly account for its status as a nontaxable entity.

Plaintiff has failed to prove that the adjustment is "generally considered acceptable in the financial community." *Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701, 713 (1983). Plaintiff's only authority for adjusting a valuation analysis in order to account for S–Corp. status is one article: Shackelford, *Valuation of "S" Corporations*, 7 Business Valuation Review 159 (1988). Whatever "generally considered acceptable in the financial community" means, plaintiff clearly has not met this standard by relying on one article by a relatively unknown author. Indeed, the one other author that Shackelford cites suggests a modest (9%) increase in the value of an entity as an S–Corp. rather than a C–Corp., which is quite different from the 51.7% increase Ms. Danyluk suggested. *See id., citing* Leung, *Tax Reform Act of 1986: Considerations for Business Valuations*, 6 Business Valuation Review at 60–61. Thus, I reject Ms. Danyluk's adjustment to reflect Radiology's S–Corp. status.

Although I reject Ms. Danyluk's S–Corp. adjustment, I believe that her ultimate goal of treating Radiology according to its nontaxable nature is meritorious. That is, I agree with Ms. Danyluk's goal but disagree with her methodology. Ms. Danyluk

deducted an amount for taxes then added back that amount to the cash flows. Although it is not entirely clear, it seems that she did this in order that I would deem Radiology comparable to the companies she used in calculating the industry average debt to equity ratio and in calculating the adjustment for the implicit minority discount. However, I believe that Ms. Danyluk and plaintiff should have seen the extreme weaknesses of the implicit minority discount argument and of the argument for the use of the industry average debt to equity ratio. Thus, I believe that Ms. Danyluk and plaintiff never should have argued that I deduct taxes in the first place. Therefore, in applying the discounted cash flow approach, I use cash flows that neither include a deduction for taxes nor a corresponding adjustment (*i.e.*, an addition) for taxes.

In holding that I should ignore taxes under the discounted cash flow approach because of Radiology's nontaxable status, I rely on a number of factors. First, Ms. Danyluk's treatment and my treatment of taxes ultimately parallel each other. Second, Mr. Stryker made no deduction for taxes in his earnings valuation analysis. (Stryker Vol. II at 124.) Finally, and most importantly, under an earnings valuation analysis, what is important to an investor is what the investor ultimately can keep in his pocket. *See* S. Pratt, *Valuing Small Businesses and Professional Practices* 36 (1986). Thus, I believe that ignoring taxes altogether is the only way that the discounted cash flow analysis can reflect accurately the value of Radiology's cash flows to its investors.

### (c) Non–Operating Asset Adjustment

The final adjustment Ms. Danyluk made to her raw discounted cash flow calculation was her adjustment for Radiology's non-operating assets. That is, Ms. Danyluk contends that I must add the value of Radiology's non-operating assets to her valuation analysis to find the total value of the company. Ms. Danyluk found Radiology's non-operating assets to be "other investments" ($1,621), the cash surrender value

of officers' life insurance ($54,249), and excess working capital ($1,355,000).

This Court clearly must add the value of non-operating assets to an earnings based valuation analysis. *See Neal, supra,* at 38–39, 49. Defendants do not dispute the propriety of a non-operating asset adjustment to an earnings based valuation analysis. However, they contend that the amount of Ms. Danyluk's adjustment for the non-operating assets, specifically the non-operating asset of excess working capital, is incorrect.

Excess working capital is the amount of working capital beyond the amount an entity needs to fund its business. *See Neal, supra,* at 38–39. Ms. Danyluk calculated Radiology's year-end working capital to be $1,724,000. Ms. Danyluk used Robert Morris Associates statistics to determine the industry average ratio of revenue to required working capital. She computed this industry average ratio to be 13.1 to 1. Applying this ratio to Radiology's 1986 revenue of $4,838,000 results in a required working capital amount of $369,000. Ms. Danyluk then subtracted the required working capital ($369,000) from her calculation of year-end working capital ($1,724,000) to reach excess working capital of $1,355,000.

Defendants contend that Ms. Danyluk incorrectly calculated Radiology's year-end working capital by including in working capital amounts appearing in Radiology's year-end financial statements that represented earnings to be distributed to shareholders after the company completed its year-end financial statements. Defendants argue that the subtraction of post year-end distributions would better reflect Radiology's exact amount of year-end working capital.

Although defendants argument facially is appealing, I reject it. If I adjusted working capital only for post year-end distributions, I would undermine the consistency of the financial statements. That is, I believe that in order to consider the post year-end working capital distributions, I also would have to consider post year-end working capital accretions. Since I do not have the

information regarding these accretions, I hold that it is best to value working capital completely as of December 31, 1986. Thus, I conclude that Ms. Danyluk's calculation of working capital of $1,724,000 is the more useful calculation, that Radiology's excess working capital equals $1,355,000, and that the value of Radiology's non-operating assets equals $1,410,870 ($1,621 + $54,249 + $1,355,000).

### B. *Defendants Valuation Methodology*

Defendants' expert, Charles Stryker, attempted to value Radiology by using one method: the "Delaware Block Method." Even though the Delaware courts have used the Delaware Block Method infrequently since *Weinberger*, the Delaware courts still consider it an acceptable procedure for valuing a company. *See Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 940 (1985). The Delaware Block Method actually is a combination of three generally accepted methods for valuation: the asset approach, the market approach and the earnings approach.

### 1. The Asset Approach

■ Mr. Stryker's valuation analysis began with a valuation of Radiology's assets. He adjusted the book value of assets to reflect their present value. He also added $294,000 for Radiology's work force. Finally, Mr. Stryker reduced the amount of an account payable from $100,000 to $62,000. Mr. Stryker did not add an amount to reflect Radiology's goodwill. He believed that all of Radiology's goodwill belonged to Papastavros Associates since he believed that patients came to Radiology because of the professional reputation of Papastavros Associates, not the reputation of Radiology's x-ray technicians.

Plaintiff argues that Mr. Stryker's failure to include any amount for goodwill and the 60% weight he used in combining the three approaches under the Delaware Block Method (*i.e.*, the asset approach, the market approach and the earnings approach) were inappropriate. As to the failure to make an addition for goodwill, plaintiff argues that Radiology's expectation of future business was not so much the future business of patients but the future patronage of Papastavros Associates. Clearly, the twenty-one year relationship between the two companies justified this expectation. Thus, I agree that the failure to include an amount for goodwill was inappropriate.

The unjustified failure to include an amount for goodwill affects my decision as to the proper weight of the asset prong of the Delaware Block Method. First, except for corporations with significant natural resource assets or with significant non-operating assets, the Delaware courts generally have refrained from weighing the asset prong heavily in applying the Delaware Block Method when the earnings valuation method appears reliable. *See Gibbons v. Schenley Industries, Inc.*, Del.Ch., 339 A.2d 460, 473 (1975); *Heller v. Munsingwear, Inc.*, Del.Ch., 98 A.2d 774, 777 (1953). Further, in this case, Mr. Stryker's analysis incorrectly did not include an amount for goodwill. This failure to include such an amount results in his asset value reflecting only the liquidation value rather than the going-concern value of Radiology. The use of liquidation value rather than going-concern value is inappropriate. *See Rosenblatt*, 493 A.2d at 942. Thus, I give no weight to Mr. Stryker's asset valuation because Delaware courts generally have not weighed the asset prong heavily and because Mr. Stryker calculated an asset value that more closely reflected Radiology's liquidation value than it going-concern value.

### 2. The Market Approach

■ The second prong of the Delaware Block Method valuation analysis is the market value factor. Delaware courts have recognized offers for purchase as valid indications of value for purposes of appraisal. *See Application of Delaware Racing Ass'n*, Del.Supr., 213 A.2d 203, 211 (1965). Mr. Stryker's market analysis focused on a sale of Radiology stock and two offers for the purchase of Radiology in calculating Radiology's market value to be $453 per share.

The first factor upon which Mr. Stryker relied in calculating Radiology's market

value was the December 1986 sale of Radiology stock. In that transaction, Drs. Papastavros and Piendak sold 22.5% of Radiology stock to Drs. Koniver, Fiss and Mansoory at a price of $400 per share.

The May 4, 1984, offer of Diagnostek, Inc. of Alberquerque, New Mexico was the first offer to purchase Radiology upon which Mr. Stryker relied in calculating Radiology's market value. The net amount of this offer was $4,808,787 or $483 per share.

The "well developed" offer of Wilmington Medical Center to purchase Radiology was the second offer upon which Mr. Stryker relied in calculating Radiology's market value. The net amount of this offer was $4,726.679 or $475 per share.

Mr. Stryker considered the Wilmington Medical Center offer to be "well developed" because it had conducted due diligence and used sophisticated advisers. Also, it had hired an appraiser to value the company. Further, it even retained Coopers & Lybrand to do a business review to support the offer.

Plaintiff argues that this Court cannot use any facet of Mr. Stryker's market valuation analysis because Dr. Papastavros set the pricing parameters of each transaction (the stock sale and the two offers for purchase) and Dr. Papastavros was unaware of the true value of Radiology. It is clear that this Court can give no weight to the $400 stock sale price. Dr. Papastavros set the price for the stock sale. Dr. Papastavros did not have the competency to set a price reflecting Radiology's market value. *See In re Radiology Associates, supra,* at 30–31. Further, Drs. Koniver, Fiss and Mansoory blindly relied on the fairness of this price. *See id.* Thus, this Court cannot justify any reliance on this stock sale price as an accurate reflection of Radiology's market value.

As far as the offers to purchase Radiology, Dr. Papastavros set the initial parameters for the making of such offers. He set the parameters of the price by approaching the two potential offerors with an offer to sell Radiology for $5,000,000. Plaintiff argues that just as the stock sale price is useless as an indication of Radiology's mar-

ket value because of Dr. Papastavros' involvement so too are the prices of the offers to purchase.

Defendants contend that the offerors' dickering over the $5,000,000 price, even if Dr. Papastavros set it, is an indication of the reliability of their offers as reflections of Radiology's market price. That is, defendants argue that the failure of the offerors to snap up this deal is an indication that, if anything, the $5,000,000 price was too high. However, I cannot get past the fact that Dr. Papastavros set the asking price of $5,000,000. Thus, a person who did not have the ability to determine Radiology's value established the outside limit someone would have to pay to purchase Radiology. The offerors predicated their offers on Dr. Papastavros' asking price and their decision not to buy Radiology for the full $5,000,000, in all likelihood, partially relied on Dr. Papastavros asking price as an indication of Radiology's value. Thus, I cannot justify any reliance on these offers as an accurate reflection of Radiology's market value. Mr. Stryker's market valuation analysis thus deserves no weight.

### 3. The Earnings Approach

The final prong of the Delaware Block Method valuation analysis is the earnings value factor. Mr. Stryker based his earnings analysis on the pre-tax earnings of Radiology for the five-year period of 1982 through 1986. In analyzing these earnings, Mr. Stryker gave extra weight to the 1986 earnings because he believed they better reflected Radiology's current earning power. Mr. Stryker capitalized the earnings at a 15% discount rate. His earnings approach valued Radiology at $6,687,-000 or $672 per share.

The parties argue over what Radiology's 1985 earnings were. However, I do not need to address this issue because I find the reliance on historical earnings unnecessary in this case where reliable projections are available, whose preparers undoubtedly considered Radiology's historical earnings in making their calculations. I find it intrinsically more appealing to rely on the future prospects of a company, where reli-

able projections are available, than the historical earnings of the company because the theoretically more correct measure of the entity's value, under an earnings valuation approach, is the present value of its future cash flows or earnings. Correspondingly, I find it unnecessary to address the parties' arguments as to the proper capitalization rate and the proper treatment of Radiology's growth rate because reliance on historical earnings is unwarranted in this case where reliable projections are available.

In rejecting Mr. Stryker's earnings approach, I note, parenthetically, plaintiff's argument that this Court can consider defendants' breach of fiduciary duty in weighing defendants' valuation analyses. "If corporate fiduciaries engage in self-dealing and fix the merger price by procedures not calculated to yield a fair price, these facts should, and will, be considered in assessing the credibility of the respondent corporations' valuation contentions." *Neal v. Alabama By-Products, supra,* at 11. Defendants argue that Mr. Stryker performed the valuation analyses and only became a part of this litigation after this Court had determined liability.

The concern over credibility, in my opinion, is not so much with Mr. Stryker as it is with the information given to him. That is, the conduct of persons who supply the information upon which one bases a valuation analysis is relevant to the credibility of that information and, therefore, that analysis. *See Alabama By-Products v. Neal,* Del.Supr., 588 A.2d 255, 258 (1991). In this case, defendants' breach of fiduciary duty undermines the credibility of the information defendants supplied to Mr. Stryker and, therefore, undermines the credibility of Mr. Stryker's earnings approach.

### C. *Summary*

I conclude that Mr. Stryker's valuation analysis as to asset value and market value deserve no weight. I give no weight to his earnings valuation principally because of the availability of reliable projections of Radiology's earnings, and secondarily because of my doubts as to the credibility of the information supplied to him.

As far as Ms. Danyluk's analysis, I conclude that her comparable company valuation deserves no weight because of the noncomparability of the companies chosen. Thus, I am left to use Ms. Danyluk's discounted cash flow valuation. However, as discussed earlier, I use only a 5% growth rate and do not use her implicit minority discount adjustment. Also, I do not use her S-Corp. adjustment directly. Therefore, I find the fair value of plaintiff's shares as follows:

<u>(In Thousands of Dollars)</u>

| | 238 Days 1987 | 1988 | 1989 | 1990 | 1991 | Terminal Year |
|---|---|---|---|---|---|---|
| Net Sales | 3228 | 5197 | 5457 | 5730 | 6016 | 6317 |
| General & Administrative | 2082 | 3352 | 3520 | 3696 | 3880 | 4074 |
| Officers Salary | 362 | 555 | 555 | 555 | 555 | 583 |
| Depreciation | 145 | 234 | 246 | 258 | 271 | 284 |
| Rent | 164 | 252 | 252 | 252 | 252 | 265 |
| Operating Expenses | 2753 | 4393 | 4573 | 4761 | 4958 | 5206 |
| Operating Profit | 475 | 804 | 884 | 969 | 1058 | 1111 |
| Interest Expense | 176 | 232 | 194 | 156 | 125 | 131 |
| Other Expense | 12 | 19 | 19 | 19 | 19 | 19 |
| Profit Before Taxes | 287 | 553 | 671 | 794 | 914 | 961 |
| Adjustment for Officers Salaries | 313 | 472 | 464 | 455 | 446 | 464 |
| Adjusted Profit Before Taxes | 600 | 1025 | 1135 | 1249 | 1360 | 1425 |
| Total Long-term Interest Expense | 176 | 232 | 194 | 156 | 125 | 131 |

| | 238 Days 1987 | 1988 | 1989 | 1990 | 1991 | Terminal Year |
|---|---|---|---|---|---|---|
| Adjusted Profit Before Interest Expense | 776 | 1257 | 1329 | 1405 | 1485 | 1556 |
| Taxes @ 34% | 0 | 0 | 0 | 0 | 0 | 0 |
| Debt–Free Net Income | 776 | 1257 | 1329 | 1405 | 1485 | 1556 |
| Plus: Depreciation | 145 | 234 | 246 | 258 | 271 | |
| Gross Cash Flow | 921 | 1491 | 1575 | 1663 | 1756 | |
| Less: Capital Expenditures | 163 | 250 | 250 | 250 | 250 | |
| Incremental Working Capital | 14 | 23 | 24 | 25 | 26 | |
| Net Cash Flow | 744 | 1218 | 1301 | 1388 | 1480 | |
| Present Value Time Period | .3260 | 1.1521 | 2.1521 | 3.1521 | 4.1521 | |
| Present Value Factor @ 18% Discount Rate | .9475 | .8264 | .7003 | .5935 | .5030 | |
| Present Value of Cash Flow | 705 | 1007 | 911 | 824 | 744 | |
| Terminal Year Debt–Free Net Income | | 1556 | | | | |
| Capitalization Factor | | 13% | | | | |
| Capitalized Value | | 11,969 | | | | |
| Present Value Factor for Terminal Year | | .5030 | | | | |
| Present Value of Capitalized Amount | | 6020 | | | | |
| Sum of Present Values of Cash Flows | | 4191 | | | | |
| | | 10,211 | | | | |
| Less: Sum of Current and Long-term Portion of Debt | | 840 | | | | |
| | | 9371 | | | | |
| Add: Non–Operating Assets | | 1411 | | | | |
| Fair Value of Common Equity | | **10,782** | | | | |
| Fair Value of Common Equity (9950 Shares Outstanding) (Per Share Basis) | | **1,084** | | | | |
| Fair Value of Dr. Kurtz's 250 Shares | | **271,000** | | | | |

---

### III. THE LAND–HO LOANS

▮ The second major issue that I must address is the determination of what amount represents the damages to be awarded to plaintiff for the Land–Ho loan.

In an earlier decision, I held that Dr. Papastavros' decision to have Radiology loan a total of $715,000 to Land–Ho was self-interested and constituted a violation of his

fiduciary duties. *See In re Radiology Associates, Inc., supra,* at 35.

The loans purportedly were demand notes and Dr. Papastavros supposedly could call them at any time. Radiology made the loans to Land–Ho at a time when Papastavros Associates was starving for cash. Papastavros Associates' cash crunch resulted from a malfunctioning computer system. This cash crunch resulted in a drop of Papastavros Associates' professional fees. A cutback in the amount of Radiology's charges to Papastavros Associates followed Papastavros Associates' cash crunch. This cutback lead to a reduction in the amount of salary and distributions paid to Radiology's shareholders.

Having considered the testimony of the witnesses on this point, I find that Radiology likely would have lent money to Papastavros Associates had it not made the Land–Ho loan. I hold this belief because, first, Papastavros Associates was an established practice with a steady earnings stream. The loan would have provided Radiology with a better return on the capital than the bank would have provided and the loan would carry little risk. Second, Papastavros Associates was a related party. Thus, if Radiology had the money available and Papastavros Associates provided the best available return on the capital with little risk, Radiology, in all likelihood, would have loaned Papastavros Associates the money. Finally, Radiology, in effect, had loaned Papastavros Associates substantial amounts in 1985: $75,000 cash loan; $120,000 increase in allowable outstanding accounts receivable; and a 1985 reduction in Papastavros Associates "billings" by Radiology followed by a "gift" of $900,000 worth of accounts receivable to Radiology by Papastavros Associates. These loans strongly suggest that Radiology would have loaned Papastavros Associates the money it needed if it were available.

Since Radiology probably would have loaned Papastavros Associates the money, plaintiff claims that Papastavros Associates' professional fees would have been $635,000 more than they were. Correspondingly, plaintiff argues that Radiology's charges to Papastavros Associates would have been more. Also, he argues that Radiology's distributions and salaries would have been $671,500 more. Specifically, plaintiff argues that if Radiology had not loaned the money to Land–Ho, in the end, plaintiff would have received $16,875 more in total distributions from Radiology.

Defendants argue that they owe plaintiff only $584.53 as a result of the Land–Ho loans. They argue that Dr. Papastavros' breach of fiduciary duty in loaning money to Land–Ho only entitles plaintiff to his proportionate share of the interest Land–Ho did not pay to Radiology as the loan obligated it to pay.

Defendants attack plaintiff's theory of damages in four ways. First, they argue that Radiology's salaries were, in fact, salaries and not returns on equity. Thus, defendants contend plaintiff's argument that the decrease in salaries paid by Radiology properly is a part of plaintiff's damage due to the Land–Ho loan is without merit. However, as stated earlier, Radiology salaries wholly or, at least, mostly represent returns on equity. *See id.* at 9. Thus, this argument by defendants fails to undermine plaintiff's theory of damages.

Defendants also argue that plaintiff's theory of damages rests on a ruling that Papastavros Associates acted improperly in reducing the amount of payments to Radiology when, in fact, this Court made no such ruling. Plaintiff responds (and I agree) that plaintiff's theory, indeed, does not rest on such a ruling. Plaintiff only is attempting to show that Radiology would have had money available to loan to Papastavros Associates if Radiology had not loaned money to Land–Ho and that if this money was available, Radiology likely would have loaned it to Papastavros Associates thereby alleviating the cutbacks caused by the cash crunch. Plaintiff is not attempting to show that the reduced payments were improper but that the reductions flowed from the breach of duty.

The third point that defendants argue is the causal relationship between Papastavros Associates' cash crunch and the Land–

Ho loans. That is, defendants argue that the loans to Land–Ho and Papastavros Associates' cash crunch were not related. However, as I stated above, Radiology likely would have loaned Papastavros Associates the money if it was available because Papastavros Associates was a related entity and represented a good investment and because Radiology had loaned Papastavros Associates substantial amounts in 1985 thereby indicating its willingness and desire to loan Papastavros Associates money if it was available. Thus, I conclude that, in fact, the Land–Ho loan and Papastavros Associates' cash crunch were related.

The final point defendants raise is that plaintiff's calculation as to the amount of Radiology's lost distributions is incorrect because it is greater than Papastavros Associates' lost revenue and Radiology's revenue, over time, had equaled 70% of Papastavros Associates' revenue. Thus, defendants argue that Radiology's lost revenue equals $444,500 (70% of $635,000), at most. I agree. Radiology's sole source of revenue came from Papastavros Associates. Given their relationship, the best reflection of Radiology's lost revenue is an average percentage of Papastavros Associates' revenues to Radiology revenue.

Defendants further contend that lost revenue does not necessarily equal lost distributions. However, in this case, I find that $444,500 represents best the lost distributions. I believe that lost distributions equal lost revenue since Radiology had less revenue not so much because it did less business but because it cut its fees to Papastavros Associates.

Given these conclusions as to defendants' attacks on plaintiff's theory of damages, I am left to choose between defendants' $23,381 figure (total amount of interest Land–Ho has not paid to Radiology on the loans required) or plaintiff's $444,500 figure (Radiology shareholders' lost distributions). Defendants' figure represents only the amount of interest Radiology should have received. Plaintiff's figure attempts to represent what plaintiff would have received had the breach of fiduciary duties not taken place. Plaintiff's figure is a more accurate representation of the actual damage done to plaintiff because of the loans to Land–Ho. Further, I am wary of giving directors incentives to breach their fiduciary duties. That is, if I merely return to plaintiff the interest not paid, it would give directors little incentive to not breach their fiduciary duties through loans to themselves because the chances of being found liable are minimal and because the damages awarded only would be the amount of unpaid interest on the improper loans. Thus, I hold that Dr. Papastavros' breach of fiduciary duty as to the Land–Ho loan entitles plaintiff to $11,168 ($444,500 × [250/9950]).

## IV. COSTS

 The final issue before me is plaintiff's request that defendants be ordered to pay his costs, including plaintiff's expert witness fees. Plaintiff's expert witness costs as to this litigation were solely to establish fair value. Ms. Danyluk had nothing to do with the resolution of the entire fairness claim. Thus, as with any appraisal proceeding, plaintiff should bear the costs of his own expert. *See Neal, supra,* at 10–11; *Pinson v. Campbell–Taggart, Inc.,* Del.Ch., C.A. No. 7499, 1989 WL 17438, Jacobs, V.C. (Feb. 28, 1989, *revised,* Apr. 21, Aug. 11 and Nov. 8, 1989), slip op. at 20. With respect to costs of this proceeding, however, I conclude that it would be more equitable to assess them against the defendants. 8 *Del.C.* § 262(j).

## V. CONCLUSION

I find the fair value of Dr. Kurtz's 250 shares of Radiology stock to be $271,000 (or $1,084 per share). In addition, Dr. Papastavros' breach of fiduciary duty with regard to the Land–Ho loan entitles Dr. Kurtz to $11,168. Finally, this litigation does not entitle plaintiff to recover his expert witness fees, but all costs of the proceeding are assessed against defendants.

The parties shall agree upon and submit an appropriate form of order. Absent such

agreement, plaintiff shall submit an order on notice.