**STEINER CORPORATION, a Nevada corporation, Petitioner,**

v.

**Bertha C. BENNINGHOFF, as Trustee of the Bertha C. Benninghoff Trust Dated January 6, 1993, Patricia A. Benninghoff, George R. Benninghoff, Joshua W. Benninghoff, Chapin J. Benninghoff, Ted. J. Benninghoff, and Virginia D. Benninghoff, Respondents.**

No. CV–N–94–0840–ECR.

United States District Court,
D. Nevada.

May 26, 1998.

Peter W. Billings, Jr., John E.S. Robson, P. Bruce Badger, of Fabian & Clendenin, Salt Lake City, UT, and Douglas A. Emerick, Beesley & Peck, Ltd., Reno, NV, for Petitioner.

Scott A. Glogovac, Reno, NV, for Respondents.

## ORDER

EDWARD C. REED, Jr., District Judge.

This matter was tried to the Court in a thirteen-day trial. At the close of trial, it was taken under consideration by the Court for decision. The following are our conclusions of fact and law, which dispose of all pending issues in this case.

## I. STATEMENT OF THE CASE

Petitioner Steiner Corporation ("Steiner") originally filed this action on October 28, 1994, in the Second Judicial District Court in and for the County of Washoe, State of Nevada. Respondents (collectively, "the Benninghoffs") removed the case to this Court on November 28, 1994, based on diversity jurisdiction, and pursuant to 28 U.S.C. §§ 1332 and 1441.

Steiner seeks a judicial determination, pursuant to Nev.Rev.Stat. § 78.501,[1] of the "fair value" of Steiner's common stock as of July

---

1. Subsequent to the events giving rise to this action, the Nevada Legislature repealed the statutes regarding minority shareholders' right to dissent from a proposed merger, and the method of resolving disputes between dissenters and the majority shareholders over the fair value of the minority stockholders' shares. Act of June 25, 1991, ch. 442, §§ 22 to 42, 1991 Nev.Stat. 1184, 1195–99 *codified at* Nev.Rev.Stat.Ann. §§ 78.474 to 476, §§ 78.481 to 502 (Michie 1994), *and repealed by* Act of July 5, 1995, ch. 586, § 130, 1995 Nev.Stat.2079, 2121.

The new statutes enacted to replace *former* Nev.Rev.Stat. § 78.471 et seq. are identical to the repealed sections. *See* Nev.Rev.Stat. §§ 92A.315, 92A.320, 92A.360 to .500 (Michie Supp.1995) (codifying Act of July 5, 1995, ch. 586, §§ 38, 39, 44–59, 1995 Nev.Stat. 2079, 2087–92). However, we will continue to refer to the statutes under the numbering system in effect at the time this action was filed.

26, 1994. On that date, Steiner merged with Steiner Holding Corp., and bought out all minority shareholders at a price of $1200 per share except for the respondents, who had dissented from the vote in favor of the merger and elected dissenters' rights under N.R.S. § 78.476. As dissenters, respondents are entitled to receive the "fair value" of their shares, which Steiner contends is no more than $840 per share. The Benninghoffs, on the other hand, contend that the fair value of their shares is at least $1950 per share. As required by statute, Steiner paid each of the Benninghoffs its estimate (i.e., $840) of the fair value of his or her shares prior to filing for judicial determination of the fair value of those shares. Thus we must determine whether the true fair value of the shares exceeds $840 per share; if it does, then Steiner must pay the difference in price to the Benninghoffs, as well as interest on that amount pursuant to N.R.S. § 78.477.

In addition to the underlying dispute over valuation of the stock, both sides are claiming that the other acted "arbitrarily, vexatiously, and not in good faith," which, under N.R.S. § 78.502, would allow the prevailing party to collect attorney's fees from the party acting in bad faith.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Steiner, a privately owned company which at the time of the merger was already more than one hundred years old, has always been engaged primarily in the linen supply and textile rental businesses. At the time of the merger, Steiner also had subsidiaries engaged in private label food canning and textile filter manufacturing. Steiner is organized under Nevada law, with its headquarters in Salt Lake City, Utah, but also has a substantial overseas presence. At the time of the merger, roughly half (52.3%) of Steiner's linen/textile revenues came from outside the United States, which amounted to 38% of Steiner's total revenues. The bulk of Steiner's foreign operations was located in four countries: Australia, Brazil, Canada, and Germany.

Prior to the merger, there were 367,351 outstanding shares of Steiner common stock.

Over 93% of the outstanding shares of common stock was owned by members of the Steiner family—descendants of the company's founder, George A. Steiner—either directly or through a trust. In addition, members of the family filled most of the important positions in company management, and made up a majority of the board of directors.

Steiner has always been a privately held company; its shares have never been publicly traded. However, early in the company's history, employees of the company were permitted to acquire its stock. Thus most of the minority shareholders in 1994, including the Benninghoffs, were descendants of original Steiner employees. The Benninghoffs are descendants of one George Benninghoff, who acquired his stock around the year 1900, and who apparently worked for Steiner for over fifty years. By 1994, this stock had been passed down, in intergenerational transfers, to the respondents, as well as to other members of the Benninghoff family not involved in this case. The respondents owned the following number of shares at the time of the merger: Bertha C. Benninghoff, as Trustee of the Bertha C. Benninghoff Trust dated January 6, 1993—2,859 shares; George R. Benninghoff—180 shares; George R. and Patricia A. Benninghoff—465 shares; Joshua W. Benninghoff—34 shares; Chapin J. Benninghoff—34 shares; Ted J. Benninghoff—180 shares; Ted J. and Virginia D. Benninghoff—540 shares.

In 1993, after several years of facing a potential accumulated earnings tax, Steiner decided to pursue the cash-out merger transaction. An accumulated earnings tax may be imposed, under I.R.C. § 531, when a company, "for the purpose of avoiding the income tax with respect to its shareholders ... permit[s] earnings and profits to accumulate instead of being divided or distributed." I.R.C. § 532(a). That is, the tax may be imposed when a company chooses not to make distributions to its shareholders because its shareholders (or at least its controlling shareholders) prefer not to receive dividends—and consequently be liable for income tax on those dividends—at a given time. Instead, they would rather let the

value of the stock appreciate and either pass that gain on to their heirs with a stepped up basis at death, or sell the stock and pay tax at the capital gains rate rather than the higher personal income tax rate applicable to dividends. To the extent that such earnings are retained to provide for the "reasonable needs of the business," however, no accumulated earnings tax will be imposed.

Steiner appears to have been genuinely concerned that it was accumulating earnings in excess of what it needed to provide for its reasonable business needs—or at least that the IRS would see it that way. Of course, if Steiner had been willing to make a distribution to its shareholders, that would have taken care of the problem. However, for various reasons—which may or may not have been convincing to the IRS had it ever actually sought to impose an accumulated earnings tax—Steiner has historically been reluctant to issue dividends to its shareholders. It is not necessary for us to draw any conclusions about whether an accumulated earnings tax should have been imposed on Steiner. We merely note that the possibility of such a tax being imposed did exist, and that concern with such a possibility was the motivating force behind Steiner management's decision to pursue the merger transaction with Steiner Holding Corp.

As part of the overall transaction, Steiner planned to use some of its accumulated cash to buy out the shares of all minority shareholders—that is, all shareholders not members of, or controlled by members of, the Steiner family. Since the Steiner family already controlled a clear majority of Steiner's shares, the cash-out merger could have been approved without the consent of any of the minority shareholders. However, Steiner management decided to condition the merger on approval of a majority of the minority shareholders.

Steiner originally advised the minority shareholders of the potential merger and accompanying cash-out offer by letter in June of 1994. More than 82.5% of the minority shareholders voted in favor of the merger, including some members of the Benninghoff family. Only one non-Benninghoff shareholder voted against the merger. Even this shareholder tendered his shares for redemption at $1200 per share, however, leaving respondents as the only shareholders to elect dissenters' rights. In addition to the minority shareholders who tendered their shares, nine members of the Steiner family also tendered shares at the $1200 per share offer.

In determining what price to offer, the Steiner family hired the valuation firm of Houlihan, Lokey, Howard, and Zukin ("HLHZ"), which determined the per share price of Steiner stock to be $1418. The HLHZ study was not released to the board; instead, the Steiner family proposed that minority shares be re-purchased at the rate of $975 per share. However, the board of directors appointed a Special Committee, composed of the two outside members of the board, James Gardner and Victor Lund, to represent the interests of the minority. The Special Committee, in turn, retained independent legal counsel, and hired J.P. Morgan Securities, Inc. ("J.P. Morgan" or "JPM") to perform a valuation of the company and its stock. J.P. Morgan performed a valuation study of Steiner in February and March of 1994, which resulted in a value range of $1100–$1500 per share. Upon receiving the results of JPM's study, the Special Committee informed members of the Steiner family that the value of the stock fell within a range of $1100–$1400 per share. The only explanation for the reduction in the high end price was that both Gardner and Lund felt the high end of the range given by JPM was "too high," although neither man gave a very satisfactory explanation of why he felt this way. After some rather brief negotiations, the Steiners and the Special Committee agreed on the $1200 per share price.

Upon receiving notice of the vote regarding the proposed merger, the respondents attempted to obtain more information from Steiner about how the $1200 price had been set. While some of their requests for information were granted, others were not. Given the fact that there was less than a month between notice of the vote being sent out and the vote itself, the Benninghoffs had little time to seek out professional advice as to the actual value of their shares. Nonetheless, believing that the value was more than $1200

per share, they gave notice that they intended to elect dissenters' rights under N.R.S. § 78.476, and voted against the merger. After the vote, the Benninghoffs retained David Nolte of Arthur Andersen to perform a valuation analysis of Steiner's shares. Nolte prepared a report to this end, and testified at trial. After receiving Nolte's report, Steiner retained another expert, Dr. Allan Kleidon. Dr. Kleidon did not prepare his own ground-up valuation of Steiner; instead, he examined Nolte's work for flaws. Dr. Kleidon also testified at trial.

N.R.S. § 78.476 provides that minority shareholders dissenting from a corporate action such as a merger are entitled to receive the "fair value" of their shares. If the dissenters and the company cannot reach agreement on what the fair value of the shares is, the company can file suit to have the court make that determination. Both Steiner and the Benninghoffs have substantially complied with all the requirements of the dissenters' rights provisions, so all that is left is for this Court to determine what the fair value of the respondents' shares is.

Of course, in actual practice, making such a determination is not easy. In the trial in this case, three expert witnesses testified for several days regarding the proper methods for determining the fair value of a company, and of Steiner in particular. While we note that the attorneys for both sides did excellent jobs in presenting a difficult case, we cannot simply accept either side's contention as to the ultimate value of Steiner's shares. None of the experts was completely convincing on all of the issues presented. Unfortunately, this leaves us in a position of having to redo certain calculations with different inputs for some variables. Prior to making such calculations, however, we must make specific findings as to the validity of each of the proposed methods of valuation, the reliability of the data used in applying each of these methods, and the applicability of certain assumptions involved in most economic analysis.

One of the first questions that must be addressed in any valuation study is what "standard of value" the valuation study is meant to determine.[2] In this case, that standard is set by statute—the Nevada dissenters' rights statutes direct that dissenting shareholders should receive the "fair value" of their shares. N.R.S. § 78.476. Unfortunately, the statutes do not elaborate on what "fair value" means, or on what should be considered in order to arrive at fair value. However, we essentially resolved the matter for this case in a previous order (# 60), which disposed of the parties' cross-motions for summary judgment. There, we held that "fair value" would "be determined by considering (1) the pre-merger market value of the shares, discounted for illiquidity, (2) the pre-merger enterprise value of the corporation as a whole, (3) the pre-merger net asset value of the corporation, and (4) any other factor bearing on value. Each measure of value will then be assigned a certain weight, and then averaged appropriately."

Further, we denied Steiner's request for a ruling that the respondents should be compensated only for the "value of their shares," rather than for the proportional interest in Steiner that their shares represent. The significance of this holding only becomes clear when it is understood that the "value of their shares"—that is, the value for which those shares would trade in the stock market if Steiner were a publicly traded company—is less than the proportional value of the company that those shares represent. In other words, for most publicly traded companies, the price at which one share of stock trades, multiplied by the number of shares outstanding, does not equal the total value of the company. In holding that dissenting shareholders are entitled to more than just the "value of their shares," we relied primarily on the one Nevada case addressing dissenting stockholder rights, *Southdown v. McGinnis*, 89 Nev. 184, 510 P.2d 636 (1973).

In addition, we addressed several other issues in our previous order. However, it

**2.** For general guidance on valuation issues, see Shannon P. Pratt, Robert F. Reilly, & Robert P. Schweihs, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (3d ed.1996), one of the leading reference sources in the valuation field. The text in its entirety was introduced into evidence by the petitioner, and both parties referred to it several times during trial. This Court, as well, has relied heavily on this volume in preparing this order.

became evident at trial that the parties have misconstrued and consistently mischaracterized parts of this order. We do not necessarily blame the parties for this, however, for while our order was consistent with the established case law, the sad fact is that the established case law is not entirely consistent with accepted economic theory. Of course, it is the law that we must follow, which the various experts in valuation theory and economics who testified at trial may not have completely realized. Nonetheless, we set forth the governing law in our previous order, and what is left to us now is to apply that law to the facts presented at trial. Before going on to do so, however, we will address a few specific problems that came up repeatedly at trial.

To begin with, our order holds that the respondents' shares should be subject to neither a minority discount nor a control premium. In brief, a minority discount is a reduction in the price of shares imposed because those shares are traded as part of a minority block. A control premium is an increase in the price of shares sold as part of a majority block, which someone will pay in order to gain control of a company. During the trial, the parties consistently referred to the value of a minority *interest* in a company as a share, or block of shares, that had been subjected to a minority *discount*, and to a controlling *interest* in a company as a share, or block of shares, that had been subjected to a control *premium*. From this, the parties appeared to argue that the Benninghoffs' shares could not be valued as if part of a minority interest, since that would mean that some sort of implied minority discount had been applied, but that the shares could not be valued as if part of a controlling interest, either, since that would mean that some sort of implied control premium had been applied. (Unsurprisingly, the Benninghoffs tended to stress the "no minority discount" ruling, while Steiner tended to stress the "no control premium" ruling.) The problem with that view, of course, is that there is no "in between" position. Either a shareholder has control over a company or she does not. There is no middle, neutral, value above the minority price yet below the control price, which could either be increased by a control premium or decreased by a minority discount.

Thus if we were to refuse to consider a "minority value" because it inherently includes a minority discount, and were also to refuse to consider a "control value" because it somehow includes a control premium, we would have nothing left to consider. There would be no theoretical basis for putting any value at all on the respondents' shares, and we would be forced to disregard *all* of the methods of valuation presented by the parties at trial, since all of these methods arrive at either a minority value or a control value. Instead, we have considered all of the methods of valuation proposed by both sides, and, whatever the standard of value a method might provide, the result will not, in keeping with our order, be subjected to either a discount or a premium.

Specifically, the three methods most discussed at trial—and, we note, most accepted, both in the business valuation literature and the cases—are (1) discounted cash flow analysis, or "DCF"; (2) the "market comparables" or "guideline companies" approach; and (3) the "acquisitions" method. Each of these methods will be examined in detail below, both for its theoretical basis and its reliability in this case. For now, though, we note simply that both the DCF approach (at least as presented by all of the parties) and the acquisitions approach unquestionably produce a control value, while the market comparables approach results in a "marketable minority" value. In this context, a "control value" essentially equals "enterprise value," or the value of the business as a whole, while "minority value" approximates the market value of what Steiner's shares would trade for if it were a public company.

Thus, although all three methods were presented as ways of calculating the "enterprise value" prong of the four-factor test for "fair value" set forth both above and in our prior order, the market comparables approach actually produces a *market* value, which is a separate factor in our "fair value" test. It is true that respondents' expert, David Nolte, attempted to extrapolate from the results of his market comparables ap-

proach to an enterprise value, which he did by adding a roughly 35% "adjustment to reach enterprise value." While we are convinced that this is a legitimate way to approach the problem of using a market comparables approach to get enterprise value, it is not one that we can consider. Referring to the increase as an "adjustment to reach enterprise value" does not change the fact that such an increase is, in fact, a control premium, which we cannot apply. However, if the market comparables approach is used to calculate *market* value, no adjustments are necessary. Not only does this save us from applying a forbidden premium or discount, it also removes the added uncertainty of what percentage would be an appropriate increase.

One additional area of significant disagreement is Steiner's interpretation of our holding that "the appraised value of Respondents' shares may not include any value deriving from post-merger changes in corporate control, ownership, debt structure or management philosophy, or from any possible future sale of Petitioner to a third party. . . ." Steiner repeatedly seized on this holding as a basis for opposing a variety of assumptions that must be made in applying any valuation methodology. For instance, one of the assumptions necessary to a DCF analysis regards the capital structure of the company being valued. It appears to be a legitimate subject of debate in the valuation field as to whether the capital structure used (i.e., the ratio of debt to equity financing) should be the company's actual capital structure or one closer to the industry average. Since Steiner's capital structure differs significantly from the industry norm, this a question which we must answer. But we are not precluded from using the industry average, as Steiner contends, because the existing Steiner management has "no plans" to change the capital structure.

The fact that existing management does not plan to change the capital structure does not mean that any assumed change in that structure would only arise as a result of some post-merger change in ownership or control. Assuming a different capital structure for purposes of making certain calculations is not the same as anticipating a specific gain which it is believed will accrue immediately after the merger. While "fair value" is not the same as "fair market value," "fair value" is still obtained by considering the behavior of market forces. And while assuming that the particular capital structure envisioned by a specific investor will be implemented after the merger would not be appropriate, considering changes that market actors would assume on average in placing a rational value on the company would. Using Steiner's actual debt to equity ratio, which has been established as a result of the particular needs and desires of the Steiner family, would be as improper as using the specific capital structure of any other particular investor. Either would result in "investment value," a different standard than "fair value." This differs from fair value, which depends on how rational actors in the marketplace, on average, would value Steiner as a whole. The market places a value on how it expects a company to perform in the future. And over time, market participants will expect a company to move to its optimal position in terms of variables like debt structure. Incorporating *expectations* about a company's future performance that are held as of the merger date does not violate our holding that post-merger gains not be considered. We cannot examine post-merger/pre-trial events to see if those expectations were correct, but the expectations themselves not only can, but must, be considered. The basic premise of all valuation theory is that what a company is worth today is a reflection of what it can be expected to earn in the future.

In a sense, it is the ability to move to what the market would deem optimal that is important. If the Steiner family had only gained control of the company as a result of the merger, then it might be inappropriate to consider any changes that only a control owner could make. But the Steiner family had unquestioned control of the company prior to the merger. And while it is true that some additional value is obtained in gaining 100% ownership, as opposed to 93% ownership, even 93% ownership was a sufficient degree of control for the Steiners to make any management decisions necessary— such as how much debt to carry.

■ It is also important to note that the 20%/80% ratio used by JPM and Nolte is *not* the actual industry average. Rather, it is significantly lower. This makes sense, since debt is not as valuable to Steiner as to other companies, due to the fact that only 62% of its interest expense functions as a shield. For companies without foreign holdings, that number is usually 100%. However, holding debt is not completely worthless to Steiner. At least 62% of interest expense *would* serve as a tax shield, so debt should have some value to Steiner. The market would thus expect a capital structure for Steiner to incorporate more than 4% debt, although not as much as the actual industry average. Therefore, we will use the 20%/80% ratio.

In addition, Steiner opposes any and all use of the acquisition method of valuation, on the basis that the data used in this method are derived from transactions involving changes in control, and thus that the entire method violates our prior holding. But Steiner's objections miss the point. Our ruling on this issue was based on the statute, which requires valuation "as of the date 'immediately before the effectuation of the corporate action to which [s]he objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable.'" The types of price changes to which the statute would appear to be referring are more likely gains (or losses) attributable to speculative trading of the company's stock prompted by news of the merger beginning to leak out. Relying on one Delaware court's interpretation of the similar Delaware statute, we concluded that consideration of any gains accruing solely as a result the merger was prohibited. Synergy gains, resulting when the merger of two companies in one industry produces savings from the combining of operations, are obviously gains that result solely from the merger. Therefore we clearly could not take into account gains which might have occurred if Steiner had bought or been bought by another textile rental company. But valuing Steiner based on past mergers and acquisitions transactions, which may or may not have themselves included the value of anticipated synergy gains in the deal price, is not the same

thing. If we were to disregard this method, it would not be because it violates our prior order.

Now that we have addressed certain fundamental disputes, we can move on to a step-by-step discussion of the process used to value Steiner's shares.

## A. The First Prong: Pre–Merger Market Value of the Shares, Discounted for Illiquidity

■ As noted above, we held in our previous order in this case that: "The fair value of Respondents' shares will be determined by considering (1) the pre-merger market value of the shares, discounted for illiquidity, (2) the pre-merger enterprise value of the corporation as a whole, (3) the pre-merger net asset value of the corporation, and (4) any other factor bearing on value. Each measure of value will then be assigned a certain weight, and then averaged appropriately." Most of the testimony and evidence presented at trial was aimed at determining enterprise value, the second prong of this test. Nonetheless, we must determine a value for the first prong as well. If Steiner had been a public corporation, of course, with its stock publicly traded on an exchange, the "market value" of its shares would have been easy to determine. As it is, however, there really was no market value for shares of Steiner stock—because there was no market for such shares.

Steiner attempts to rely on the limited prior trading history of its stock to determine market value. However, the fact that the company itself occasionally agreed to repurchase shares did not create a *market* for those shares. The repurchases occurred on an intermittent basis, and the prices, which were set by Steiner and not subject to negotiation, were heavily discounted. The fact that some shareholders actually sold their shares at these prices means next-to-nothing—sometimes, obtaining an immediate cash payment of any size is more important to an individual than any long-term gain that might otherwise result. Thus we have not placed any significant weight on the prices set for prior repurchases of stock by Steiner.

■ However, there is another way of determining a "market value" of Steiner's stock. As suggested in *Southdown v. McGinnis*, the appropriate market value to consider in such a case is a "hypothetical" one. *Southdown v. McGinnis*, 89 Nev. 184, 510 P.2d 636, 641 (1973). Determining such a hypothetical market price requires looking to similar, but public, corporations, and using such corporations to estimate the price at which Steiner's stocks would trade if Steiner were a public company. *Id.* 510 P.2d at 642. This is exactly the process encompassed by the "market comparables" approach. As discussed above, this approach was discussed by the parties in terms of determining enterprise value, but, because it actually calculates a "marketable minority value" rather than an enterprise value, is more appropriately employed under the first prong of our test.

■ Put simply, the "market comparables" method compares the closely held company for which valuation is sought with publicly traded companies in the same industry. Thus the reliability of this method depends primarily on how closely comparable the publicly traded companies are to the closely held company. "The utility of the comparable company approach depends on the similarity between the company the court is valuing and the companies used for comparison. At some point, the differences become so large that the use of the comparable company method becomes meaningless for valuation purposes." *In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del.Ch.1991) (rejecting use of market comparables approach due to differences in composition and size between the proposed comparable firms and the company being valued). However, in one of the leading texts on valuing closely held companies, the authors suggest that "[w]e usually would not reject the method just because we were not satisfied with either the number or the degree of comparability of available guideline companies." Pratt, *supra*, at 210–11. In addition to Mr. Nolte, all of the experts in this case approve of this method in theory, although they vary in terms of how reliable they feel it is in valuing Steiner in particular. Thus we are convinced that this *method* is an appropriate one to at least consider.

It appears to be true, as Steiner stressed at trial, that there is no one company *exactly* like Steiner as a whole. However, courts have approved the process by which a company's various subsidiaries are compared separately to comparable companies. *See, e.g., Rapid–American Corp. v. Harris*, 603 A.2d 796, 803 (Del.1992) (approving Court of Chancery's use of "segmented" valuation of company's subsidiaries). Both JPM and Mr. Nolte used this segmented method, comparing Steiner's subsidiary American Fine Foods to various food processing businesses, while comparing the rest of Steiner to various linen rental companies.

Both JPM and Nolte used the following companies as comparable to Steiner's linen business (i.e., all of Steiner except the foods division): Angelica, Cintas, G & K Services, Health Care Services Group, National Services Industries, Unifirst, and Unitog. Nolte used the following companies as comparable to American Fine Foods: Curtis Burns Foods, Dole Food, Smucker, Seneca Foods, Stokely USA, and Dean Foods. JPM's food comparables were similar, with one exception—JPM used Heinz instead of Dean Foods. (Notably, though, the foods division makes up such a small part of Steiner's overall value that most of the discussion has centered around the linen comparables.) In addition, evidence was presented at trial that other valuation studies of Steiner over the years have shown remarkable consistency in their choice of comparable companies. For instance, the HLHZ study commissioned by the Steiner family in 1993 used all of the same linen companies. So did a 1991 study by HLHZ. A 1987 Bank of America study used five of the same comparables, excluding only Health Care Services Group and Unitog. Likewise, a publication of the Textile Rental Services Association ("TRSA"), an industry group, noted that all of these companies except Health Care Services Group were appropriate to consider as comparables when valuing closely held companies in the industry. Furthermore, Kevin Steiner told JPM that all seven of these companies were Steiner's main competitors.

Dr. Kleidon, however, although he did consider the method, ultimately decided that it deserved "little weight." He felt that none of the proposed comparables was truly comparable to Steiner. He pointed to the fact that Steiner has a much more significant foreign presence than any of the comparables, and that the composition of Steiner's business is more heavily skewed towards "flat linens" instead of industrial linens, or uniforms, while most of the comparables are more heavily involved in uniforms. In addition, Steiner has a different capital structure than most of the comparables, with far less than the average amount of debt.

Notwithstanding Dr. Kleidon's concerns, we feel that the market comparables method is appropriate to use in valuing Steiner, and that all seven proposed comparable companies should be considered, given the number of different sources that have used the same companies and that have relied on the same method. The differences Dr. Kleidon pointed out indicate that conservative "multiples" should be used, and that less weight should be placed on this method than Mr. Nolte has suggested. But the evidence clearly shows that this method is reliable and should be used.

Having determined which companies are sufficiently similar to Steiner for use as comparables, various "multiples" are calculated from those companies' data. Two commonly used such multiples are the "price to earnings" multiple and the "total invested capital (TIC) to EBITDA" multiple. Both Nolte and Kleidon calculated these two multiples; Nolte also calculated "price to EBITDA" and "TIC to earnings," while Kleidon also calculated "TIC to EBIT." In short, a ratio is calculated for each guideline company from its known data (for example, the known price or value of its equity is divided by its known EBITDA figure), and the ratios of all the guideline companies are averaged. Then the proper "multiple" for the subject company is picked, which may or may not be equal to the average of the guideline companies' ratios, depending on how closely comparable those companies are to the subject company. For each ratio Nolte picked a "multiple" slightly below the *lower* of the mean or median of the

ratios. This multiple is then applied to (i.e., multiplied by) the known values of the subject company, such as EBITDA or earnings, to calculate the value of the subject company's equity. (Note that for multiples using a TIC value, the value of the company's debt must be subtracted out of this final figure before it represents the value of the subject company's equity.)

After Note calculated values for Steiner using each of the four ratios above, he averaged them. Although he then added a "control premium" to that value, his unadjusted value of $515,534,000 (which, as discussed above, is what we must use) is comfortably within the ranges calculated by both JPM and Kleidon (JPM's range = $514,290,000 to $551,030,000; Kleidon's range = $364,500,-000 to $579,000,000) While deriving a range of values is no doubt an acceptable, or even desirable, method of conducting a valuation study, this Court must arrive at a specific value in order to enter judgment in this case. Since Nolte's unadjusted value falls in the ranges suggested by both of Steiner's experts, we feel that it is a reasonable figure to accept as the market value of Steiner.

█ Before dividing the $515,534,000 figure by the numbers of outstanding shares to get a per share value, however, we must address the issue of excess cash. Both Nolte and Kleidon took excess cash into consideration, although they differ in regard to the proper amount to include. As a non-operating asset, excess cash held by Steiner would not be included in the value of Steiner as calculated by any of the proposed methods, yet would unquestionably increase the value of its shares. Nolte went through a detailed analysis of the amount of excess cash Steiner needed for its operations (in other words, "non-excess" cash), the amount of cash Steiner has typically held in past years, and the amount of cash the comparable companies held, and determined that Steiner had at least $68,300,000 in excess cash at the time of the merger. Kleidon assumed, on the other hand, that only the amount of cash used to buy out minority shareholders in the merger, or $50,000,000, was actually excess. But Steiner already had excess cash in prior years, before it started accumulating cash in

anticipation of the merger (the evidence clearly shows that the amount of cash Steiner had did shoot up dramatically in 1994, right before the merger)—otherwise, Steiner would not have been faced with a potential accumulated earnings tax in the first place. If anything, Nolte probably underestimated the amount of excess cash, since he only included cash held in the Steiner General Office, and excluded all cash held by Steiner's other divisions and subsidiaries. Thus all cash held in Steiner's foreign division has been treated as "non-excess," nullifying Steiner's argument that foreign-held cash it could not repatriate should not be treated as excess. Therefore, we hold that Steiner did have $68,300,000 in excess cash.

■ Thus, to calculate a per share market value, the amount of excess cash ($68,300,000) is added to the value of equity derived from the market comparables method ($515,534,000). This results in a total of $583,834,000. Dividing this figure by the number of shares outstanding at the time of the merger (367,351) results in a per share market value of $1589.31.

However, our previous order indicated that the pre-merger market value of the shares should be discounted for the shares' illiquidity. Thus we must determine the proper percentage discount to apply. There was evidence presented at trial that such discounts can range anywhere from 20% to 60%. Discounts for lack of a ready market affect both control and minority shares in closely held corporations, although discounts for minority shares tend to be larger. However, in this case, as indicated in our previous order, the fact that the respondents' shares might well have been subject to a substantial illiquidity discount if, prior to the merger, the respondents had tried to sell them, recedes in importance when the corporation itself is buying the shares and has in fact actively sought to purchase the shares in the first place. It would be inconsistent to allow a company to force minority shareholders to sell their shares back to the corporation, but to reduce the price the corporation had to pay for those shares because no one would ever want to buy them. In addition, as Steiner has repeatedly stressed, it is extremely unlikely

that the shares will ever be resold. Thus Steiner hardly cares whether a future market for the shares will exist. Besides, the existence of any future market for the shares lies almost entirely within Steiner's control (i.e., Steiner could decide to "go public"—not that it will, but it *could* ). Thus it seems most appropriate to impose an illiquidity discount toward the smaller end of the range than might otherwise be imposed, such as 25%. Applying a 25% discount to the $1589.31 per share value reduces that value to $1191.98. Thus the value of Steiner as calculated under the first prong of our test, market value, is $1191.98.

**B. The Second Prong: Pre–Merger Enterprise Value of Steiner as a Whole**

The second prong of our four-prong test for fair value is to determine enterprise value. As mentioned above, the parties presented three methods for determining enterprise value, although we found one of these methods to be more appropriate for determining market value. This leaves us with two methods, the DCF method and the acquisitions method. Both of these will be discussed below.

**1. Discounted Cash Flow Method**

Since all of the experts who testified in this case used the DCF method for determining the enterprise value of Steiner, and since this method has been generally accepted by courts faced with valuation cases, we have no difficulty in holding that this is a method we should consider. *See, e.g., In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485 (Del.Ch. 1991); *Cede & Co. v. Technicolor, Inc.*, Civ.A. No. 7129, 1990 WL 161084 (Del.Ch.1990), *aff'd in part and rev'd in part on other grounds*, 634 A.2d 345 (Del.1993); *Neal v. Alabama By–Products Corp.*, Civ.A. No. 8282, 1990 WL 109243 (Del.Ch.1990), *aff'd*, 588 A.2d 255 (Del.1991); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983); *Dermody v. Sticco*, 191 N.J.Super. 192, 465 A.2d 948 (Ct. Ch.Div.1983). One Delaware court described the Discounted Cash Flow Method as "in theory the single best technique to estimate the value of an economic asset." *Cede & Co.*, 1990 WL 161084, at *7.

▐ The theory behind the DCF method is that the current value of a company is essentially equal to the amount of cash it will generate in the future, discounted to present value. The DCF method has three main components, as follows:

   (a) "an estimation of net cash flows that the firm will generate and when, over some period;"

   (b) "a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's cash flows beyond the projection period; and"

   (c) "a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value."

*Cede & Co.*, 1990 WL 161084, at *7.

### (a) ESTIMATING FUTURE CASH FLOWS: STEP ONE OF THE DCF METHOD

The first step in the DCF method is to project, or forecast, "net cash flows" for Steiner for a certain number of years into the future. One measure of cash flow used by all the experts in this case is "EBITDA"—Earnings Before Interest, Taxes, Depreciation, and Amortization. EBITDA is simply the amount of sales, or revenue, generated by the company, minus the cost of generating those sales (and general operating assets). Dividing the EBITDA figure for a given year by that year's sales figure results in an "EBITDA margin" for that year. Of course, the process works in reverse, as well: if the amount of sales and the EBITDA margin for a year are known (or estimatable) quantities, then that year's EBITDA, or cash flow, can be projected.

Thus, both Nolte and Kleidon have estimated Steiner's future cash flows by estimating its future sales, and then applying an "average" EBITDA margin to those amounts.[3] Nolte estimated future sales by starting with the latest actual sales figure (i.e., for the fiscal year ending June 30, 1994), and projected sales growth of 8% in the first year, decreasing to 6% by the last year for which specific projections were made (i.e., 1999). Notably, Kleidon accepted Nolte's sales projections with absolutely no changes, which we take as a good indication that those figures are fairly reliable, given the amount of disagreement between the two that exists in other areas. Thus, we hold that future sales projections contained in both Nolte's and Kleidon's reports are acceptable. (We also note that, however they were obtained, JPM's figures are higher.)

▐ Where Nolte and Kleidon differ is over what the "average" EBITDA margin should be. Nolte used a 15% margin, while Kleidon used a 14% margin. It is true, as Kleidon pointed out repeatedly, that the actual "average" of recent years' EBITDA margins was lower than 15%. But in 1994, the U.S. and global economies were just coming out of recession. Thus the previous several years were not necessarily reflective of what the following few years would have in store. Analysts' reports introduced by Steiner on the various comparable companies, all indicate that recovery in the industry had begun by the first half of 1994, with better prospects predicted than would have been indicated by looking solely at data from the recent recessionary past. And experts in the valuation field explicitly caution against basing future projections solely on averages of past data. Pratt, *supra*, at 197 ("All economic, financial, and regulatory literature makes

---

**3.** We note here that although JPM prepared a report, which was entered into evidence in this case, it does not provide enough information for us to determine how JPM made its projections. Of course, we understand that, as Mr. Engel (the JPM vice president who prepared the report, presented it to the Special Committee, and testified regarding it at trial) stated repeatedly, the written report was accompanied by an oral presentation, and the written product does not constitute the entire report. While this may well be true, some additional written work must have existed at some point. But as Mr. Engel also testified, JPM "routinely destroys" all work papers after a report has been prepared. Routine or not, this would seem to be in direct violation of the explicit requirements of the standards set by several different professional appraisal organizations, including the Uniform Standards for Professional Appraisal Practice set by the Appraisal Standards Board of the Appraisal Foundation, and the Business Valuation Standards set by the American Society of Appraisers, and in any case is not endorsed by this Court.

it clear that valuation is a function of expected prospective economic income. The past history is relevant only to the extent that it may, in some cases, provide useful guidance in projecting future economic income. Nevertheless, it is not as uncommon as one might think to see 'projections' that are nothing more than a statistical extrapolation of past results, with no analysis as to the extent to which the future generating forces will or will not duplicate the resent past. Usually, they will not."). While Steiner may not have been affected in exactly the same way or at the same rate as its competitors, it was still eminently reasonable to project better performance for Steiner after 1994 than in the previous years.

In addition, we note that Steiner's own budget for fiscal year 1995 projected an EBITDA margin of 15.4%. Of course, testimony was presented that Steiner did not expect to make 100% of its budget projections every year, but aimed for around 95%. However, 95% of 15.4% is 14.63%, closer to 15% than 14%. Therefore, we hold that 15% is a reasonable figure to use as an EBITDA margin.

■■■ Given an EBITDA margin of 15%, and the projected sales figures for 1995 – 1999, we can calculate projected EBITDA figures for those years as well. Once we have EBITDA figures, however, we must make several adjustments before we have *net* cash flow figures appropriate for discounting to present value. It is not disputed that the correct cash flow figure to discount should be calculated on an after-tax, debt-free basis. Thus, in order to calculate cash flow on an after-tax basis, we must subtract out the amount of taxes Steiner will likely pay in each year. But taxes are not calculated as a percentage of EBITDA. Rather, they are calculated as a percentage of "taxable income." Thus we must first subtract interest expense, depreciation, and amortization from EBITDA, since these amounts are generally deducted from total income to reach taxable income for IRS purposes. Once we have taxable income, that figure is multiplied by Steiner's effective tax rate, or 43%. The resulting amount is subtracted from taxable income to obtain an after-tax net income

figure. However, since we want an after-tax net *cash flow* figure, rather than an after-tax *net income* figure, we must add back in amounts for interest expense, depreciation, and amortization—since these were taken out to arrive at net income in the first place. No one disputes that, for depreciation and amortization, the exact same amount should be added back as was subtracted out originally. However, when it comes to the add back of interest expense, controversy erupts again. Nolte added back the entire amount of interest expense ($1,619,983) subtracted from EBITDA in the first place. This is clearly incorrect. Interest expense should be added back on an after-tax basis, as Kleidon pointed out. See Pratt, *supra,* at 187. For most companies, then, the amount of interest subtracted out should be multiplied by an amount equal to (1 − tax rate) to obtain the correct amount to add back in. For a company with a 43% effective tax rate, such as Steiner, 57% of interest expense should be added back.

However, even 57% is actually incorrect. Given the extremely complicated interplay between interest deductions and the foreign tax credit, Steiner can, in effect, only deduct 62% of its interest expense. Therefore, the net effect is to reduce the interest expense added back by only 62% of 43%, or 26.66%, rather than by the full 43%. Hence 73.34% ($1,188,095.53) of interest expense is added back to after-tax net income to calculate after-tax net *cash flow.*

In addition to the adjustments discussed above, other adjustments must be made to after-tax net income to arrive at after-tax, *debt-free,* net cash flow. These include adding "equity in net income from unconsolidated subsidiaries" and "net cash from discontinued operations," as well as subtracting "capital expenditures," the "cost of acquisitions," the "increased cost of acquisitions," and "increases in net working capital." However, there is no dispute over either the appropriateness or the amount of these adjustments, which appear in the same form in both Nolte's and Kleidon's reports. Thus we will not make any changes to these adjustments, or go into any detail on why they are necessary.

When all of the calculations detailed above have been made, we obtain particularized projections of after-tax, debt-free, net cash flows for the years 1995 – 1999. These figures are as follows: NCF (1995) = $8,637,-219.53; NCF (1996) = $6,777,487.53; NCF (1997) = $9,155,006.53; NCF (1998) = $22,-502,877.53; NCF (1999) = $26,167,265.53. Each of these amounts can then be discounted to present value (or more precisely, what the present value would have been in July of 1994), once we have determined the appropriate discount rate to use. This will be discussed in detail below.

### (b) ESTIMATING TERMINAL VALUE: STEP TWO OF THE DCF METHOD

█ The next step in the DCF analysis is to calculate the "terminal value" of the company. Terminal value is the value of cash flows expected to be received by the company beyond the "terminal year" (which is the final year for which particularized cash flow projections are made, in this case 1999) discounted to the "present value" that those cash flows will have in the *terminal year* (i.e., 1999), and not to the value that they have in the *year of valuation* (i.e., 1994). Once the terminal value has been calculated, it is then discounted again to its value in the year of valuation (1994).

The most critical step in calculating terminal value is determining the "perpetual growth rate." It is assumed that, from the terminal year onward, growth will occur at a constant rate every year thereafter. The parties vigorously disputed what the perpetual growth rate should be. JPM used 4%, Nolte used 5%, and Kleidon gives values using 4%, 4.5%, and 5%. (Note that all of these figures are *nominal* rates—that is, they include inflation. Thus with a 5% nominal growth rate, if inflation were 3%, the *real* growth rate would only be 2%.) Given that the perpetual growth rate is often assumed to be the growth rate in the terminal year, which Nolte projected to be 6% and with which Kleidon did not disagree, a perpetual growth rate of 5% seems appropriate.

Once the perpetual growth rate has been determined, it is used to calculate the terminal value of the company. In theory, this is

done by calculating the company's cash flow for every year from the terminal year to infinity (each year's cash flow being the same percentage larger than the year before's, with that percentage equal to the perpetual growth rate), adding up the cash flow figures for all of those years, and discounting the resulting sum to its value in the terminal year. Of course, one cannot possibly calculate an individual value for every year between the terminal year and eternity. But the end result, as the product of what is known as. a "growing perpetuity," can be approximated by the following equation:

$$TV = \frac{P_n(1 + g)}{(k - g)}$$

TV = terminal value
$P_n$ = projected cash flow in the year "n"
n = number of years in the discrete projection period
k = discount rate (the proper discount rate to use will be discussed and calculated in the following section)
g =. perpetual growth rate

Filling in the equation with the values obtained above results in:

$$TV = \frac{\$26,167,265.53\,(1 + .05)}{(.0978 - .05)}$$
$$TV = \frac{\$27,475,628.81}{(.0478)}$$
$$TV = \$574,803,950$$

### (c) DETERMINING THE DISCOUNT RATE: STEP THREE OF THE DCF METHOD

The final component of the DCF method is to determine the appropriate rate at which to discount the projected future cash flows and the projected terminal value of the company to present value. The discount rate is essentially the cost of capital—that is, the interest rate at which the company would have to invest the "present value" in order to have the projected future value at the end of the projection period. Unfortunately, the discount rate is probably the most hotly contested issue in this case.

Probably the most accepted way to calculate the discount rate, at least for discounting cash flows, is the Capital Asset Pricing Model ("CAPM"). *See, e.g., In re Radiology*

*Assocs.*, 611 A.2d at 492–93; *Cede & Co.*, 1990 WL 161084, at *28. Both JPM and Kleidon used the CAPM to calculate the discount rate, which, under the CAPM, is referred to as the "Weighted Average Cost of Capital," or "WACC." Nolte did not calculate a discount rate at all, but merely accepted one of the rates proposed by JPM.

■ The CAPM consists of the following three steps, which will be discussed separately below:

(1) calculate the company's cost of equity;

(2) calculate the company's cost of borrowing, or debt;

(3) calculate the weighted average of the costs of equity and debt, with the weights determined by the capital structure, or ratio of debt to equity.

*See In re Radiology Assocs.*, 611 A.2d at 492–93.

### (i) The Cost of Equity

To determine the cost of equity ($K_e$), the following equation is used:

$$K_e = R_f + beta(RP_m)$$

$R_f$ = risk free rate of return on 5–year U.S. Treasury Notes

$Rp_m$ = market risk premium

beta = "the non-diversified risk associated with the economy as a whole as it affects this firm," *Id.* at 492, or as Steiner put it in its trial brief, "an adjustment to the general risk premium to reflect the particular risk of the company."

### The Risk Free Rate

■ The appropriate risk-free rate for determining the cost of equity is generally considered to be the rate of return on five-year U.S. Treasury Notes ("risk free" because there is little risk of the U.S. defaulting). Although not "risky," the price of Treasury Notes does fluctuate daily. The major disagreement in this case stems primarily from the change in the Treasury Note rate between February and July of 1994. During this period, the rate rose more than 100 basis points (i.e., 1%). In February 1994, when JPM conducted its initial analysis, the rate on 5–year Treasury Notes was 5.45%, which was the rate that JPM used in calculating the cost of equity. However, by the time of the merger in July, the rate had risen to 6.9%. Thus when Nolte simply adopted JPM's WACC, which had been calculated in February using February data, to discount cash flow figures projected using July data, he was essentially using the wrong risk-free rate.

Nolte claimed at trial that he used JPM's rate (8.6%) because he felt it was "appropriate." But he was unable to give a satisfactory explanation of why it was appropriate, even though rates had changed. It is certainly true, as Nolte suggested, that there is a relationship between the discount rate and the projected cash flows—the discount rate does reflect the riskiness of achieving the projected cash flows, so with more conservative projections one would expect to see a lower discount rate. Whether it is the discount rate or the cash flow projections that should be adjusted is a matter of some debate, although the more common view seems to be that the cash flow projections rather than the discount rate should be adjusted. Nonetheless, the discount rate is one of the conditions which is taken into account in making cash flow projections, so Nolte may well have made less conservative projections had he contemplated a higher discount rate when he made his forecast. Yet we cannot possibly accept the use of the 8.6% rate without some explanation of why that rate was appropriate.

On the other hand, Kleidon did not change Nolte's basic projections in sales and sales growth in doing his calculations. He did use a lower EBITDA margin, but that resulted in *lower* cash flow projections, which he then discounted at a *higher* discount rate to account for the rise in the risk-free rate. Thus his more conservative cash flow projections were discounted as if the risk of achieving them was much greater. While not impossible, this is not what one would generally expect to see.

Evidence was presented at trial that, leaving everything else constant, the rise in the risk-free rate alone reduced the estimated present value of Steiner from February to July by nearly 26%. This makes little sense. It seems incredibly unlikely that a 1% rise in

the interest rate on five-year Treasury Notes could cause a 100–year–old, multi-million dollar company to lose 26% of its value in a six-month period. However, the only reasonable decision we can make as to the correct risk-free rate to use is the rate from July—i.e., 6.9%. And in reality, it is unlikely that "everything else" does remain constant over time, so that the value of Steiner did not really decline by 26% in six months.

### The Market Risk Premium

■ The market risk premium is a measure of the additional return needed, on average, to convince investors to invest in the stock market rather than in risk-free Treasury Notes. In other words, the premium is compensation for taking on additional risk. Both JPM and Nolte used a 5% market risk premium. Kleidon used a market risk premium of 7.4%. The difference appears to be based on a legitimate split in the valuation profession. The market risk premium is calculated by averaging past differences between the average market rate of return and the risk-free rate. Some analysts recommend using a "time horizon" of only the past twenty years or so, which results in a risk premium of 5%, while others recommend using all available data going back as far as 1926, when the necessary data began to be accumulated and processed. While valid arguments exist on both sides of this issue, we have not attempted to resolve the entire debate. We simply find that the 5% figure is appropriate to use in this case, given that experts from both sides testified to that effect (i.e, Engel and Nolte). Thus the preponderance of the evidence supports use of the 5% market risk premium.

### Beta

In addition to the general market risk premium, the cost of equity for a company is influenced by that company's particularized degree of riskiness. Thus, while the market on average is 5% riskier than a "risk-free" investment, an individual company may be more or less risky that the market in general. The factor used to represent this concept is generally referred to as "Beta" ("beta"). Technically, a beta is the covariance of a company's rate of return against the market rate. Betas for many public companies are calculated and published periodically by several sources. If the betas for Steiner's comparable companies are known, then the beta for Steiner can be estimated.

■ Very little explanation regarding this process was presented in any of the experts' reports, although JPM does present a list of betas for Steiner's comparables. However, the beta JPM chose for Steiner seems too high in relation to the betas of the comparables. Steiner is a very risk-averse company. Given the extremely conservative management style that Steiner was so quick to point out in other contexts, the fact that Steiner has a well-diversified client base, a 100–plus–year history of steady growth, banks willing to lend it money (on a short-term basis) at LIBOR plus 1/4%, and would appear to be larger than most of its publicly traded competitors, the beta for Steiner should be near the low end of the range. In other words, Steiner's attempts at trial to portray itself as a risky little private company beset by various financial problems was not very successful. (Although we do not mean to imply that Steiner did anything wrong in attempting to portray itself as such.) Therefore, we hold that an appropriate beta for Steiner is approximately 0.75. (Note that a beta of less than 1.00 indicates that a company is less risky than the market in general. This is certainly true in Steiner's case. Given a market risk premium of 5%; and a beta of 0.75, Steiner is thus 3.75% riskier than investing in risk free Treasury Notes.)

We can now proceed to calculate the cost of equity. Plugging the values we have obtained into the formula set forth at the beginning of this section results in the following calculations:

$$K_e = R_f + beta \, (RP_m)$$

$$K_e = 6.9\% + 0.75 \, (5.0\%)$$

$$K_e = 6.9\% + 3.75\%$$

$$K_e = 10.65$$

Thus Steiner's cost of equity is 10.65%.

### (ii) The Cost of Debt

Simply put, the cost of debt is what it would cost a company to borrow money. In

other words, the cost of debt equals the amount of interest a bank would charge on a long-term loan. This rate is simply the risk free rate, adjusted upward by a "basis point spread" to take account of the fact that lending to a company is riskier than investing in Treasury Bonds. The risk free rate used in this calculation is the rate on 20–year U.S. Treasury Bonds. As debt is usually held longer than securities, the longer term rate is more appropriate. Since 20–year bond rates also rose between February and July of 1994, the same dispute arises here as in determining the cost of equity. For the reasons discussed above, we use the risk-free rate from July, or 7.57%. This rate is then adjusted upward for the particular risk of lending to Steiner, which is low compared to most companies. Typically, Steiner should be able to borrow money at only 90 – 125 basis points above the risk-free rate. Thus the cost of debt for Steiner is approximately 8.57%.

### (iii) The Weighted Average Cost of Capital

The third and last step in calculating the proper WACC to use in discounting projected cash flows is to calculate a weighted average of the costs of equity and debt.

First, although the costs of equity and debt have been established, the amount of weight to give to each figure has not. Unfortunately, this is yet another hotly disputed issue. The weighting is established by the ratio of debt to equity in the company's capital structure, but whether it is appropriate to use the company's *actual* debt to equity ratio, or one closer to the industry average, is generally open to discussion. However, as we have already discussed above, we will use the 20%/80% ratio supported by both JPM and Nolte.

### The Tax Rate

■ One last issue remains to be addressed before actually calculating the WACC. That is, the impact of the limited deductibility of interest on Steiner's effective tax rate. While both sides agree that Steiner's effective tax rate is 43%, disagreement remains over this issue. Given that Steiner has such a large foreign presence, its effective tax rate is affected by the amount of the foreign tax credit it can claim. Since the IRS requires that a proportion of interest expense be allocated to income earned in foreign countries, where that interest might not be deductible, Steiner ends up losing part of the tax shield which interest expense would normally generate. Steiner, in effect, can only deduct 62% of its interest expense. Since the WACC formula contains a tax rate variable, which is essentially designed to take account of the fact that interest payments are generally deductible and do generally produce a tax shield, the fact that Steiner does not actually receive the benefit of all its interest payments means that the typical WACC equation does not reflect Steiner's true cost of debt. This reasoning is supported by at least one Delaware case, where a nontaxable company's cost of debt was held to be equal to the risk free rate, adjusted by the risk premium, but not reduced by the tax rate. *In re Radiology Assocs.*, 611 A.2d at 492. Since the company paid no taxes, and thus could not deduct *any* of its interest payments, its true cost of capital was simply what it paid up-front to borrow money. *Id.*

While Nolte did not take this fact into account in his calculations, he did not offer a convincing explanation of why it should not be considered. No one attempted to show that, although Steiner does have limited deductibility of its interest expense, it is some percentage other than 62%. Thus we find that, in effect, Steiner can only deduct 62% of its interest expense. The WACC formula must consequently be adjusted by multiplying Steiner's tax rate of 43% by 62% before inserting it into the WACC formula.

### Calculating the WACC

Finally, at long last, we have all the necessary pieces of the discount rate puzzle, to insert into the following equation:

$$\text{WACC} = K_d (\% D) [1 - TR(0.62)] + K_e (\% E)$$

$$\text{WACC} = 8.57\% (0.20) [1 - (0.43)(0.62)] + 10.65\% (0.80)$$

$$\text{WACC} = 1.714\% (1 - 0.2666) + 8.52\%$$

$$\text{WACC} = 1.714\% (0.7334) + 8.52\%$$

$$\text{WACC} = 1.26\% + 8.52\%$$

$$\text{WACC} = 9.78\%$$

### (d) DISCOUNTING TO PRESENT VALUE

Upon completion of the WACC calculations, the final discounting can begin. The net present value of Steiner (or more precisely, its value at the time of the merger in July 1994) is thus the sum of the discounted cash flow figures and the discounted terminal value, as represented by the following equation (as calculated under the "mid-year discounting convention," which assumes that cash flows are not all received at the end of the year):

$$NPV = P_1 / (1 + k)^{.5} + P_2 / (1 + k)^{1.5} + P_3 / (1 + k)^{2.5} + P_4 / (1 + k)^{3.5} + P_5 / (1 + k)^{4.5} + TV / (1 + k)^{5}$$

$k = \text{WACC}$
$P_1 \ldots {}_5 = $ net cash flow projected for years 1 through 5
$TV = $ terminal value

Substituting values gives us:

$$\begin{aligned} NPV = {} & \$8{,}637{,}219.53 / (1 + .0978)^{.5} \\ & + \$6{,}777{,}487.53 / (1 + .0978)^{1.5} \\ & + \$9{,}155{,}006.53 / (1 + .0978)^{2.5} \\ & + \$22{,}502{,}877.53 / (1 + .0978)^{3.5} \\ & + \$26{,}167{,}265.53 / (1 + .0978)^{4.5} \\ & + \$574{,}803{,}950.00 / (1 + .0978)^{5} \end{aligned}$$

$$\begin{aligned} NPV = {} & (\$8{,}637{,}219.53 \times 0.9544) + (\$6{,}777{,}487.53 \times 0.8694) \\ & + (\$9{,}155{,}006.53 \times 0.7919) + (\$22{,}502{,}877.53 \times 0.7214) \\ & + (\$26{,}167{,}265.53 \times 0.6571) + (\$574{,}803{,}950.00 \times 0.6272) \end{aligned}$$

$$\begin{aligned} NPV = {} & \$8{,}243{,}362.32 + \$5{,}892{,}347.66 + \$7{,}249{,}849.67 \\ & + \$16{,}233{,}575.85 + \$17{,}194{,}510.18 + \$360{,}517{,}037.44 \end{aligned}$$

$$NPV = \$415{,}330{,}683.12$$

To this value add the value of excess cash ($68,300,000) and subtract the value of interest-bearing debt ($15,758,589) (as per both Nolte's and Kleidon's reports), to arrive at the total value of equity ($467,872,094.12). Finally, to get a per share value, divide by the number of shares outstanding at the time of the merger (367,351), which gives us a per share value of $1273.64.

### 2. Acquisitions Method

The final method proposed by the parties as a way to calculate enterprise value is the acquisitions method. Steiner, as discussed above, contends that use of the acquisitions

method is forbidden by our previous order. According to Steiner, this method hinges on the assumption that the company being valued (i.e., Steiner) is being sold to a third party, something we held was not to be considered. However, this is not accurate. While the data for this method are collected from transactions in which an entire company was purchased, the purchasers of those companies vary. It does not require that the *subject* company is being sold at all. This method is often used to value companies for purposes other than predicting what they would sell for in an actual sale. The fact that some transactions may have included synergy gains is, on average, at least partially offset by the fact that other transactions may have been undervalued, due to a company's need to sell quickly when in financial distress. This may well be especially true of the transactions proposed as multiples by both Nolte and JPM, since these transactions all date from the 1990–1992 period, a generally recessionary time. Thus, we feel it is appropriate to consider this method, and to use the relatively optimistic "deal value to last twelve month earnings" multiple of 1.3 used by Nolte. Therefore, we find that the per share value as calculated by this method is $1958.95, the value obtained by Nolte in his calculations. However, we do not feel it is approppropriate to give this method nearly as much weight as the DCF method in determining enterprise value.

The last step in determining a per share enterprise value is to calculate a weighted average of the values arrived at by the DCF and acquisitions methodologies. As mentioned above, the acquisitions value should receive much less weight than the DCF value. The DCF method should receive at least twice the weight of the other. Thus we will weight the DCF value of $1273.64 at 70%, and the acquisitions value of $1958.95 at 30%. This results in a final per share enterprise value of Steiner of $1479.22.

### C. The Third Prong: Pre–Merger Net Asset Value of Steiner

■ It has been suggested that this factor should not weigh too heavily in our analysis—if, indeed, it should receive any weight at all. The case law supports this

view, with this factor receiving meaningful weight in only a few types of cases—usually those involving companies owning a lot of land or other natural resources (such as oil or coal). Such companies do own assets which form a substantial part of their value as a going concern, whereas the tangible assets of companies involved in the manufacturing or service industries are not the primary components of those companies' going concern value. Steiner is primarily a service company, and though the value of the towels and other textiles it rents out should certainly be included in its total value, its main assets are non-tangible ones that are difficult to value—such as good will, an assembled and trained workforce, client lists, etc. While it would certainly be possible, at least in theory, to place some sort of value on even intangible assets such as these, insufficient evidence was presented at trial to enable us to do so. Therefore, we hold that it is not appropriate to put any weight on this factor at all.

### D. The Fourth Prong: Any Other Factor Bearing on Value

■ For the most part, the additional factors proposed by the parties under this final prong go more to the credibility or reliability of the results achieved under the other prongs than to any independent method of valuation. There is no additional measure of value proposed under this category.

The one factor discussed at any length as relevant to this category is the fact that nine members of the Steiner family also tendered their shares to Steiner in the merger at the $1200 price, although they were not required to do so. This is certainly evidence that the $1200 price was not outrageously unfair, and as such is worth considering. However, it does not, contrary to Steiner's repeated claims, conclusively prove that the $1200 price was an amazing deal for the shareholders. Steiner's argument is that, since the Steiner family members took a huge tax hit by selling their shares in the merger, rather than waiting until death and passing their shares on to their heirs at a substantially stepped-up basis, the $1200 price must have been an absolutely super, once-in-a-lifetime,

deal. Of course, for those Steiners not willing to let their heirs have all the fun, so to speak, it really was a once-in-a-lifetime deal, regardless of whether the price was completely fair. There are plenty of reasons why a shareholder (even a Steiner) might decide to sell their shares when given the opportunity—which, it could be reasonably anticipated, would not come again soon in any form, and would certainly arise less frequently after the merger than before. Sometimes even members of the Steiner family might prefer having available cash over a large estate to pass on at death. Thus the fact that family members also sold their shares at the $1200 price does not *prove* anything. Since no other factor, for which an actual money figure could be calculated, has been suggested, therefore, we must also assign no weight to this prong of the test.

### E. Weighting the Various Measures of Value

Finally, we must weight the values we have obtained under each prong of our test to obtain an ultimate per share value for Steiner. As we have decided that the final two prongs deserve no (numerical) weight at all, in light of the evidence presented at trial, we have only two factors left to weight. Given the stress put on the DCF method in particular at trial, we feel that the enterprise value component should be weighted significantly more heavily than the market value component. Thus, we give the market value figure ($1191.98) a weight of 25%, and the enterprise value figure ($1479.22) a weight of 75%. This gives us a final per share value for Steiner of $1407.42. As the Benninghoffs owned 4,292 shares at the time of the merger, Steiner should have paid them a total of $6,040,646.64. Since Steiner only paid them $840 per share, or $3,605,280.00, Steiner now owes the Benninghoffs an additional $2,435,-366.64, or $567.42 per share, plus interest as discussed below.

### F. Interest Rate

According to N.R.S. 78.477, a prevailing shareholder is entitled to interest, "computed from the effective date of the action until the date of payment, at the average rate currently paid by the entity on its principal bank loans or, if it has no bank loans, at a rate that is fair and equitable under all of the circumstances." Since Steiner itself has no loans (all debt at the time of the merger was held by American Fine Foods, the food division, which had obtained its loans on the strength of its own financial statements, not on those of the consolidated company), the proper rate of interest is thus equivalent to what Steiner's primary bank would charge Steiner itself for a loan. Steiner represented this rate to be 5.0625%, or LIBOR plus 0.25%. Although the respondents initially disputed this amount, at trial they agreed that the proper rate was 5.0625%. Therefore, we will award interest to the respondents at the rate of 5.0625% on the amount of $2,435,366.64 and computed from July 26, 1994, the effective date of the corporate action at issue, until payment is made.

### G. Bad Faith

Both sides in this case contend that the other has acted "arbitrarily, vexatiously, or in bad faith." This is understandable, since under N.R.S. § 78.502(2), when one side has acted in such a fashion, the other side can get an award of attorneys' fees (including expert witness' fees)—which have been considerable in this case. It is also understandable that each party might be frustrated with the other side's actions in the events surrounding the cash-out merger and the progress of this case, but neither side has made a sufficient showing that the other truly acted in bad faith. Thus neither side is entitled to an award of attorneys' and experts' fees in this case.

*IT IS THEREFORE HEREBY ORDERED* that the clerk shall enter judgment against the petitioner and in favor of the respondents in the amount of $2,435,366.64 in total, with the individual respondents receiving the following amounts: Bertha C. Benninghoff, as Trustee of the Bertha C. Benninghoff Trust dated January 6, 1993—$1,622,253.78; George R. Benninghoff—$102,135.60; George R. and Patricia A. Benninghoff—$263,850.30; Joshua W. Benninghoff—$19,292.28; Chapin J. Benninghoff—$19,292.28; Ted J. Benninghoff—$102,135.60; Ted J. and Virginia D. Benninghoff—$306,406.80.

*IT IS THEREFORE HEREBY FUR-THER ORDERED* that the clerk shall also enter judgment in favor of respondents and against petitioner in the form of interest on each of the amounts awarded above, commencing July 26, 1994, and running until the judgment is paid, at the rate of 5.0625%.